420 So.2d 1090 (1982)
STATE of Louisiana
v.
Louis Ronnie HOFFER.
No. 82-KA-0067.
Supreme Court of Louisiana.
October 18, 1982.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Nathan Stansbury, Dist. Atty., Michelle Jackson, Asst. Dist. Atty., for plaintiff-appellee.
Stephen K. Peters, Baton Rouge, for defendant-appellant.
DIXON, Chief Justice.
The defendant Louis Ronnie Hoffer was charged by bill of information with the crime of theft of more than five hundred dollars (R.S. 14:67).[1] He was tried by a judge who found him guilty as charged. He was sentenced to two years at hard labor, suspended on the special conditions that he serve six months in the parish jail and that he make full restitution to the victim in the amount of $7400.00 during the term of his two year active probation. The defendant has appealed arguing that the state failed to prove the necessary elements of felony theft beyond a reasonable doubt and that a sentence imposing incarceration for six months on a first offense nonviolent crime was improper without a showing of the reasons therefor.
*1091 The facts in this record reveal that the defendant attended an auto auction in Lafayette on the evening of January 26, 1978. Though the auction was for licensed and bonded automobile dealers only, the defendant was neither licensed nor bonded.
The defendant filled out an application requiring such information as his dealer number, address, credit information, etc. prior to his participating in the auction. A completed application was required of all purchasers who intended to pay for cars by means of bank draft. The application could not be located and was therefore not offered at trial.
The information on the application could not be verified at night because banks and the state offices were closed. Seeing the defendant bidding on cars, the auction owner, Mr. Estillette, approached him and introduced himself. The defendant said that he was Ronnie Hoffer and that he owned Auto City in Baton Rouge. The auction owner then went to other Baton Rouge dealers and inquired about him. They did not know him, but they did know that Auto City had put up a large sign. This satisfied Estillette; he knew that it was against the law to put up a sign without being licensed and bonded.
The defendant successfully bid on fourteen cars, signing bank draft envelopes for each one. He removed the cars from the auction lot a short time after the auction. The cars were placed on the Auto City lot and offered for sale. Depending on their condition, some of the cars were sent to a body shop for reconditioning prior to being placed on the lot.
The draft envelopes containing the titles to the cars were forwarded to the defendant's bank. Of the fourteen drafts, three were paid. The remaining eleven, totaling $7400.00, were returned unpaid, and remained unpaid at the time of trial.
Several of the fourteen cars purchased were sold to customers without titles, a violation of state law for which the defendant was subsequently convicted and fined $50.00. Several other cars were towed to a lot near the office of the attorney representing Auto City where they deteriorated from disuse and were later towed by the police as abandoned. Two or three of the cars could not be located or accounted for by the attorney. The trial judge found that the defendant disposed of all of the cars except one.
The defendant and Silas Musselwhite[2] both testified that the defendant's interest in the lot was sold to Musselwhite prior to the purchases at the auto auction. The defendant's testimony was that the lot was low on cars, and that Musselwhite asked the defendant where cars could be purchased close to Baton Rouge. Defendant knew of the Lafayette Auto Auction; Musselwhite asked him to go to the auction to purchase cars on behalf of the lot. It was the understanding between the defendant and Musselwhite that Musselwhite would be responsible for the drafts when they came in.
After the sale of the lot and the auction, the defendant helped out at the lot selling cars, as Musselwhite was unfamiliar with the car business. Three of the cars were sold. The defendant took the proceeds of the sales to the bank, paid the drafts on those cars, and received the titles for delivery to the purchasers.[3] The remaining drafts were returned unpaid.
*1092 Mr. Estillette contacted the State Department of Public Safety and the district attorney's office. The authorities inspected the lot and sought the business records. Estillette, with the titles to the remaining eleven cars in his hands, induced Musselwhite to write a check for the balance, but refused to deliver the titles until the check cleared. Musselwhite withdrew the funds from the account and the check bounced.
The lot was subsequently closed by the authorities. Other auctioneers who also had not been paid (as the lot could no longer sell cars) picked up their cars remaining on the lot.[4]
R.S. 14:67 was enacted with the purpose of combining the various statutes dealing with larceny, obtaining by false pretenses, and embezzlement. It was thus designed to remove the common law distinctions among the various crimes and to broaden the scope of the statute to include misrepresentations as to future facts as well as past and present facts. State v. Dabbs, 228 La. 960, 84 So.2d 601 (1955). The statute now includes all forms of "... misappropriation or taking of anything of value which belongs to another, either without the consent of the other ... or by means of fraudulent conduct, practices, or representations....".
The trial court found that the defendant misrepresented himself as a licensed and bonded dealer when he participated in an auction for licensed and bonded dealers only. This fact, along with the fact that the drafts were not paid during the time between their signing and the filing of the information, some seventeen months, convinced the trial judge that the requisite element of intent had been shown. The defendant challenges this conclusion of the trial court, contending first that no material misrepresentation was proved and second that a later failure to repay a debt cannot prove intent to defraud since the intent to defraud must exist at the time of the taking.
As the defendant has not admitted, and has expressly denied, any intent not to pay for the automobiles purchased, the prosecution necessarily was forced to prove intent through circumstantial evidence. R.S. 15:445;[5]State v. Duncan, 390 So.2d 859, 861 (La.1980). Where such circumstantial evidence is used, "... in order to convict, it must exclude every reasonable hypothesis of innocence." R.S. 15:438.[6]
Our standard of review in cases where a conviction is challenged based on insufficiency of the evidence is mandated by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).[7] There the United States Supreme Court determined that, to properly balance the roles of the trier of fact and the reviewing court, the relevant question is "... whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt...." 443 U.S. at 319, 99 S.Ct. at 2789. We must therefore consider whether any rational trier of fact could have found that the evidence of intent, viewed in the light most *1093 favorable to the prosecution, excluded every reasonable hypothesis of innocence. Thus, if there exists a reasonable hypothesis of innocence not excluded by the evidence, the state has not met its burden.
With respect to the representation that the defendant was a licensed and bonded dealer, the defense argues that there was no proof of such representation, and that the credit application was not offered into evidence; nor was there any testimony that the defendant ever claimed, in response to any question posed to him at the auction, that he was a licensed and bonded dealer. Such a verbal representation was not required. Any rational trier of fact could have concluded that the defendant's participation in an auction for the benefit of bonded and licensed dealers only, as evidenced by a large sign to that effect and an announcement at the commencement of the auction, was a representation that the defendant was licensed and bonded.
The defendant further argues that any misrepresentation as to his status was not material to his intent to pay for the drafts when presented. He had established a used car lot and had actually dealt regularly in automobiles for months. The defendant compares the situation to, for example, stating one's age as twenty-seven when only twenty-five.[8] There was no evidence presented to the trial judge on the materiality of the representation with respect to the intention to pay the drafts. We agree that while the misrepresentation may have an effect on the perception that the defendant had a greater ability to pay the drafts, it had no bearing on his intent to pay the drafts. Otherwise, it would be saying, for example, that someone buying wholesale without a retailer's certificate intends not to pay for the merchandise. There is no rational relation between the status as purchaser and the intention to pay. With no evidence before it to support the proposition, no rational trier of fact could conclude that the misrepresentation that the defendant was a licensed and bonded dealer indicated an intention not to honor the drafts when presented.
The defendant also challenges the trial judge's reliance on the fact that the drafts were never paid as indicating an intention, at the time they were signed, not to honor them. To allow such a conclusion, argues the defendant, would subject every defaulting debtor to criminal charges. While nonpayment is consistent with the intention not to pay, and, of course, a prerequisite to bringing criminal charges, it is not sufficiently indicative of intention not to pay to exclude beyond a reasonable doubt the intention to pay. There was also evidence presented that three of the fourteen drafts were paid, and that the defendant and Mr. Musselwhite had agreed that the drafts were to be paid by Musselwhite, as he was the owner of the lot and would receive the purchase price of the cars from their eventual retail buyers. This is a reasonable hypothesis of innocence that was not excluded by the evidence.
The state, therefore, has failed to prove beyond a reasonable doubt that the defendant had the requisite intent to fraudulently deprive the auction owner of his property.
Where there is insufficient evidence of an essential element of the crime charged, the double jeopardy clause of the Fifth Amendment precludes a second trial. Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); State v. Entertainment Specialists, Inc., 386 So.2d 653 (La. 1980). A judgment discharging the defendant therefore is ordered. Burks, supra; Entertainment Specialists, Inc., supra; State v. Peoples, 383 So.2d 1006 (La.1980); State v. Thompson, 366 So.2d 1291 (La. 1978).
For the reasons assigned, the defendant's conviction and sentence are reversed, and the defendant is ordered discharged.
LEMMON, J., concurs.
WATSON, J., dissents, disagrees with the treatment of intent.
NOTES
[1] R.S. 14:67, in pertinent part, provides:

"Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
Whoever commits the crime of theft when the misappropriation or taking amounts to a value of five hundred dollars or more shall be imprisoned, with or without hard labor, for not more than ten years, or may be fined not more than three thousand dollars, or both.
. . . . .
When there has been a misappropriation or taking by a number of distinct acts of the offender, the aggregate of the amount of the misappropriations or takings shall determine the grade of the offense."
[2] Mr. Musselwhite initially became involved with Ronnie Hoffer as a partner because he thought it was a good business investment. He brought in additional investors who would advance funds on particular cars and hold their titles until the cars were sold, realizing a profit on the transaction. The business was good and growing fast; so Musselwhite and Hoffer agreed that Hoffer's interest, originally 50%, would be sold to Musselwhite for $3000.00 in cash and a $7000.00 promissory note. The cash was paid, but the $7000.00 evidenced by the note was never paid.
[3] Hoffer began in the used car business by selling cars off the Auto City lot for the benefit of Charlie Buff, a licensed and bonded dealer, making a profit for himself by selling the cars in excess of a price set by Buff. Hoffer soon realized he could make more money buying the cars himself. He discussed the mechanics of purchasing cars with his banker who explained about drafts and approved Hoffer for such transactions. The drafts involved in this case were written on Hoffer's bank.
[4] Musselwhite testified that many of the auctioneers were cooperative with Auto City in that they would allow the titles to be taken to finance companies to be used as collateral for loans to Auto City. The auctioneers would then be paid out of the proceeds. In contrast, Estillette would not part with any titles until paid, and refused tenders of partial payment as the cars were sold, insisting instead, on advice from the district attorney, to receive the $7400.00 in one lump sum.
[5] "In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction." R.S. 15:445.
[6] "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." R.S. 15:438.
[7] The test of Jackson v. Virginia, supra, has been previously adopted by this court. State v. Tonubbee, 420 So.2d 126 (La.1982); State ex rel. Ross v. Blackburn, 403 So.2d 719 (La.1981).
[8] The defendant understates the seriousness of the misrepresentation. Hoffer represented that he had a legal status which he knew he did not have.