ANGELO RUSSO AND JENNIE RUSSO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Russo v. Commissioner
Docket No. 18666-89
United States Tax Court
T.C. Memo 1992-104; 1992 Tax Ct. Memo LEXIS 103; 63 T.C.M. (CCH) 2143; T.C.M. (RIA) 92104; February 20, 1992, Filed *103 Decision will be entered under Rule 155. R. Cody Mayo, Jr., for petitioners. Mary Beth Calkins, for respondent. SHIELDS
SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In a notice of deficiency dated April 13, 1989, respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(b)(1)
6653(b)(2)
6653(b)(1)(A)
6653(b)(1)(B)
1984
$ 476,559.85
$ 238,279.23
[1]
--   --
1985
526,127.71
263,063.86
[1]
--   --
1986
546,746.70
--   --
$ 410,060.03
[1]
Additions to tax
Year
Sec. 6661
1984
$ 119,139.96
1985
131,531.93
1986
136,686.68
The issues for decision are: (1) Whether a presumption of correctness applies to respondent's determination in the notice of deficiency *104 that petitioners understated their gross income for each of the years 1984, 1985, and 1986, and, if so, whether petitioners have presented sufficient evidence to overcome that presumption; (2) whether petitioners realized unreported income as determined by respondent for the years 1984, 1985, and 1986; (3) whether petitioners are liable for additions to tax under section 6653(b)[2] for fraud; and (4) whether petitioners are liable for additions to tax under section 6661(a) for underpayments of tax attributable to substantial understatements. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by reference. Petitioners, Angelo and Jennie Russo, resided in Shreveport, Louisiana, when they filed their petition in this *105 case. They filed joint income tax returns for the years 1984, 1985, and 1986 with the Internal Revenue Service Center in Austin, Texas. Angelo Russo (hereinafter referred to sometimes as petitioner) was born in Connecticut in 1924 and graduated from high school there. He moved to Shreveport in 1951, purchased A & J Grocery (A & J) the following year, and together with his wife operated that business until 1977 when he sold the grocery operation to Pete Terracini but kept the land and building used in the business. He leased the land and building to Mr. Terracini. After his graduation from high school in 1975, petitioners' son, Charles Russo, also worked part time at A & J until the sale to Mr. Terracini in 1977. While operating the A & J grocery business, Angelo Russo applied to the U.S. Department of Agriculture for, and was granted, authorization to participate in the food stamp program funded by that Department. That program provides food stamp coupons to qualified recipients who are entitled to use the coupons like cash to make purchases of certain food items from approved grocers. Under the applicable Federal law, the recipients are not permitted to sell the coupons for *106 cash or to use them to purchase certain ineligible items such as cigarettes and alcoholic beverages. Furthermore, an authorized grocer may not give more than 99 cents in change for food stamp coupons in any one transaction. Authorized merchants receive their payment by listing the coupons received on redemption certificates which are deposited with their banks. The merchants' accounts are subsequently credited when the banks receive payment on the redemption certificates. In 1977, when Angelo Russo sold the A & J grocery business, the Department of Agriculture was in the process of revoking or removing his authorization to participate in the food stamp program because of certain violations. After the sale of the grocery business, Angelo Russo moved to Houston, Texas, and bought a trucking business. However, at or about the time of the sale of A & J, Angelo Russo borrowed $ 20,000 from his bank and at the suggestion of Charles Russo purchased a separate business at a different location known as Mooretown Grocery & Liquor (Mooretown). After its purchase in 1977, Charles Russo undertook the management of Mooretown and applied for and received authorization to participate in the *107 food stamp program. In his application Charles Russo stated that he was the owner and operator of the business, and the authorization was issued in his name. Charles Russo operated Mooretown until some date in 1980 when Angelo Russo's trucking business in Houston apparently failed and he returned to Shreveport to find Charles Russo and Mooretown in financial difficulty. At or about this point, Angelo and Jennie Russo took over the operation of Mooretown, and Charles Russo left Shreveport to become a singer and band promoter. Later in 1980, Angelo Russo applied for and was granted authorization for Mooretown to participate in the Special Supplemental Food Program for Women, Infants, and Children (WIC). On his application for WIC participation, he listed himself as Mooretown's owner but continued to participate in the food stamp program until November 1982 under the authorization previously issued to Charles Russo. WIC operates along the same general lines as the food stamp program. Under it, qualified recipients are provided by the Department of Agriculture with WIC checks or vouchers which are redeemable at authorized stores for the purchase of specific food items. However, *108 WIC checks differ from the food stamps in at least two respects. First, the actual price of the food item or items being purchased is entered on the WIC check. Thus, no change is involved as in the food stamp program. Second, merchants receive payment for WIC sales by merely endorsing and depositing the WIC checks to their bank accounts. In 1982 Charles Russo apparently abandoned his singing and promoting career and returned to Shreveport where he and Michael Cordaro purchased Paris Grocery Store, and in its operation began to participate in the food stamp program using a new authorization granted to Charles. However, his authorization for Paris Grocery was revoked in November 1982 as the result of an investigation by the Department of Agriculture which concluded that the rules of the food stamp program had been violated by the sale of certain ineligible items in exchange for food stamps. Apparently to avoid further complications with respect to Paris Grocery, Charles Russo also voluntarily surrendered in 1982 the authorization previously issued to him to permit Mooretown to participate in that program. With the surrender of Charles' authorization, the participation of Mooretown *109 in the food stamp program was terminated. Consequently, Angelo Russo immediately applied for and was granted authorization to participate in the food stamp program as Mooretown's owner and manager. However, the State of Louisiana, which supervises the program within its boundaries, agreed to permit Mooretown's continued participation only upon the condition that Charles Russo not be involved in the store's operation. In order to comply with this requirement, Angelo signed and furnished the State authorities with a letter containing the statement that "Charles Russo is no longer associated with Mooretown Grocery in any capacity". In February 1984, William T. Turner, a special agent for the Inspector General of the Department of Agriculture, began an investigation to determine whether there had been violations of the food stamp and WIC programs at Mooretown. In March 1984, one month after the investigation started, Charles Russo resumed the day-to-day management of Mooretown allegedly because Angelo Russo had a heart attack. The record, however, contains no medical or other evidence from which a determination can be made as to the validity of this allegation or the nature and *110 extent of any such attack. However, despite the alleged change in management, petitioner continued to hold himself out as Mooretown's owner until the sale of the store in 1986, and petitioners' joint income tax returns for 1984, 1985, and 1986 contain Schedules C on which receipts and expenses of Mooretown are reported. During 1984, 1985, and 1986, Max Renov, petitioners' CPA since 1952, continued to stop by the store every 2 weeks to obtain the information needed to prepare petitioners' records including their income tax returns. This biweekly information was given to Mr. Renov by either Angelo, Jennie, or Charles Russo and included a single lump-sum sales figure that was used by Mr. Renov to determine Mooretown's annual gross receipts and to prepare a variety of State and Federal forms. For 1984, the forms on which Angelo Russo held himself out as Mooretown's owner included the following: the Schedule C attached to petitioners' 1984 Federal income tax return, the Grocer Price Report Sheets for the WIC Program, a Louisiana Preapplication Profile for a WIC Vendor, a WIC Vendor Application and Agreement, Employer's Quarterly Federal Tax Returns, and an Employer's Annual Federal *111 Unemployment (FUTA) Tax Return. On his income tax return for 1984, Charles Russo did not report any income from Mooretown and his return did not include a Schedule C for Mooretown. In early 1985, Angelo Russo was notified by the Louisiana Department of Health & Human Services that it proposed to disqualify Mooretown from participating in the WIC program. That agency had determined that Angelo Russo was the owner and manager of Mooretown based on information which he had previously provided. In connection with the proposed disqualification, petitioner retained Michael Walker, a local attorney, to represent him. Mr. Walker wrote three letters to the department on petitioner's behalf. In each letter, Mr. Walker referred to his client, Angelo Russo, as being the owner and manager of Mooretown. Charles Russo appeared at an administrative hearing held by the Health Department on August 5, 1985, in connection with this matter. His appearance, however, was on behalf of Angelo Russo as the owner of the business. At the hearing, Mooretown was disqualified from participation in the WIC program. For or during 1985, the following documents were filed with the appropriate authorities in *112 which Angelo Russo was shown as the owner of Mooretown: the Schedule C attached to petitioners' 1985 Federal income tax return, Mooretown's Grocer Price Report Sheets for the WIC Program, Mooretown's Employer's Quarterly Federal Tax Returns, and its Employer's Annual Federal Unemployment (FUTA) Tax Return. On the 1985 joint income tax return filed by Charles Russo and his wife, they reported that the only income Charles Russo received from Mooretown during the year was $ 16,000 in wages. No Schedule C for Mooretown was included in the return. On November 25, 1986, Angelo Russo, doing business as Mooretown Grocery, filed a Petition for Declaratory Judgment, Mandamus and Writ of Injunction with the 19th Judicial District Court for the Parish of East Baton Rouge in which he sought among other things a writ of injunction enjoining the department from denying his participation in the WIC program. The State court's judgment, filed on December 19, 1986, denied petitioner's request. At or about the time that the judgment was filed, Angelo Russo sold Mooretown. On Schedule C of petitioners' 1986 return, Angelo Russo is shown as the owner of Mooretown during the year, and the schedule *113 contains the receipts and expenses of Mooretown for the year. It also contains an indication that the business was sold at or near the end of the year. For or during 1986, the following forms were filed with appropriate authorities by Mooretown which contained notations that Angelo Russo was the owner of Mooretown: the Grocer Price Support Sheets for the WIC Program, a Louisiana Preapplication Profile for WIC Vendor, a WIC Vendor Application and Agreement, Employer's Quarterly Federal Tax Returns, and an Employer's Annual Federal Unemployment (FUTA) Tax Return. The income tax return of Charles and Jean Russo for 1986 reflects $ 8,500 in wage income and $ 100,000 in commission income received by Charles Russo from Mooretown. The return does not contain a Schedule C for Mooretown. In January 1987, Max Renov prepared and submitted to the proper State authorities an application by Charles Russo and James Yerby for a Sales Tax Certificate for Mooretown Grocery and Liquor. In the application it is stated that the business had been acquired on January 1, 1987, by the applicants from Angelo Russo. On January 23, 1987, an indictment was filed with the United States District Court for *114 the Western District of Louisiana in which Angelo Russo, Charles Russo, Michael A. Cordaro, and James D. Yerby were charged with criminal violations of various sections of title 7 and title 18 of the United States Code. In count I of the indictment, all of the defendants were charged with unlawfully conspiring to obtain payments for food stamps and WIC vouchers during 1983, 1984, 1985, and 1986 in violation of 7 U.S.C. section 2024(b) and 18 U.S.C. section 2. In count II, Angelo Russo was charged with making materially false and fraudulent statements to the Department of Agriculture regarding the operation of Mooretown in violation of 18 U.S.C. section 1001. In count X, Angelo Russo was charged with knowingly acquiring food stamps in an unlawful manner, i.e., by purchase for cash, in violation of 7 U.S.C. section 2024(b). In counts III, IV, VI, VII, IX, XI, and XII, Charles Russo was charged with similar violations under 42 U.S.C. section 1760(g) and 7 U.S.C. section 2024(b). The assistant U.S. attorney assigned to the case undertook to negotiate a plea bargain with the defendants. In exchange for guilty pleas to a specified number of counts by each defendant, the assistant *115 U.S. attorney offered to drop the remaining charges. Her offer was conditioned upon all of the defendants' accepting the offer. In other words, if one defendant refused the offer, she indicated that she would proceed to prosecute all of the defendants on all of the charges set out in the indictment. All of the defendants accepted her offer. Pursuant to the plea bargain, Angelo Russo pleaded guilty on March 19, 1987, to count X, i.e., purchasing $ 195 worth of food stamps for $ 135 in cash on or about August 7, 1984, in violation of 7 U.S.C. section 2024(b). At or about the same time, Charles Russo pleaded guilty to three counts of the indictment. On Schedules C to petitioners' income tax returns for the years 1984, 1985, and 1986, petitioners reported the following amounts of income and expense from Mooretown: 1984
1985
1986
Gross receipts
$ 518,010.83
$ 699,625.41
$ 509,231.81
Cost of goods sold
379,903.95
512,002.82
383,724.87
Gross income
138,106.88
187,622.59
125,506.94
Total deductions
22,753.46
43,390.04
125,421.47
Net profit
115,353.42
144,232.55
85.47
In petitioners' returns for 1984, 1985, and 1986, no part of the gross receipts of Mooretown *116 is identified as being from food stamps or WIC coupons. In the notice of deficiency dated April 13, 1989, respondent determined from the records of the Department of Agriculture and Louisiana Department of Health and Human Resources that during the years 1984, 1985, and 1986, petitioners had gross receipts from the redemption of WIC vouchers and food stamps as follows: 1984
1985
1986
WIC vouchers
$ 903,469.17
$ 846,932.34
$ 845,947.44
Food stamps
105,232.00
199,200.00
277,961.00
Total
1,008,701.17
1,046,132.34
1,123,908.44
In the notice of deficiency, respondent also determined that the gross receipts from the WIC vouchers and food stamps were not included in the gross receipts reported on the Schedules C of petitioners for the years at issue and recomputed petitioners' income taxes and deficiencies in tax for such years. Respondent further determined that some part of each deficiency was due to fraud on behalf of petitioners and that petitioners were liable for additions to tax under section 6661. OPINION 1. Presumption of Correctness and Burden of Proof with Respect to Deficiencies
Initially, petitioners contend that the presumption of correctness *117 which usually applies to a determination by respondent is not applicable to respondent's determinations of the deficiencies in this case because such determinations are arbitrary, capricious, and without reasonable foundation. We note that this contention was first raised by petitioners on brief and that ordinarily we do not consider such belated issues. See Seligman v. Commissioner, 84 T.C. 191, 197-199 (1985), affd. 796 F.2d 116 (5th Cir. 1986), and the cases cited therein. However, in this case respondent has not claimed surprise or prejudice by the delay in raising the issue and, consequently, we feel constrained to consider it. Nat Harrison Associates, Inc. v. Commissioner, 42 T.C. 601, 617 (1964). Secondly, petitioners argue that even if the presumption is applicable, they have introduced sufficient competent and relevant evidence to overcome the presumption. In either case, petitioners contend the burden of going forward with the evidence is shifted to respondent. Except in rare circumstances, a deficiency determination carries with it a presumption of correctness. Welch v. Helvering, 290 U.S. 111 (1933); *118 Bernuth v. Commissioner, 470 F.2d 710, 714 (2d Cir. 1972), affg. 57 T.C. 225 (1971). The presumption is a procedural device that places the burden of producing evidence to rebut the presumption on the taxpayer. However, if in one of the rare circumstances referred to above, the taxpayer is able to show that the statutory notice is arbitrary, capricious, or without reasonable foundation, the burden of going forward with the evidence may shift to respondent. Helvering v. Taylor, 293 U.S. 507 (1935); Dellacroce v. Commissioner, 83 T.C. 269, 287 (1984); Riland v. Commissioner, 79 T.C. 185, 201 (1982); Jackson v. Commissioner, 73 T.C. 394, 401 (1979); Suarez v. Commissioner, 58 T.C. 792, 813 (1972). Ordinarily we will not go behind the statutory notice to examine the evidence used by the Commissioner in making his determination since trials before this Court are de novo, and our determination of a petitioner's tax liability is based upon the merits of the case presented to us and not upon any previous record developed at the administrative level. *119 Jackson v. Commissioner, supra at 400 (citing Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324 (1974)). However, the difficulty of proving a negative, i.e., the nonreceipt of income, has led to the adoption of an exception, which is that we will look behind a notice of deficiency in a case involving alleged unreported income from an illegal activity where respondent rests on the presumption of correctness without introducing any substantive evidence of the income-generating activities. See Cozzi v. Commissioner, 88 T.C. 435, 444 (1987); Dellacroce v. Commissioner, 83 T.C. 269, 280 (1984). However, in the instant case respondent did not rest upon the presumption of correctness. Instead he produced the documentary evidence set forth in our findings which clearly establishes that during the years 1984, 1985, and 1986, Angelo Russo repeatedly held himself out to respondent and others as being the owner of Mooretown, the source of the income in dispute. Without attempting to repeat the complete list of such documents, we note that they include petitioners' Federal income tax returns, Mooretown's *120 quarterly employer returns, unemployment tax returns, price report sheets for the WIC program, and a number of other documents which Angelo Russo either executed or permitted others such as his counsel to execute which contain statements that he was the owner of Mooretown. In spite of the above evidence, petitioners claim that during the years under consideration, Mooretown was owned by Charles Russo and that in the operation of Mooretown, Angelo Russo was acting as the agent of Charles Russo. The only evidence in the record which tends to support petitioner's claim that Mooretown was owned by petitioner's son, Charles Russo, is the self-serving testimony of petitioner and his son which in the absence of any corroborating evidence is unacceptable. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). In view of the documentary evidence discussed above and the lack of any competent evidence in support of their claim, we conclude that not only has respondent produced substantive evidence of the income-generating activities but, from the record as a whole, has also clearly established that the income generated by Mooretown belonged to petitioner Angelo Russo. Consequently, *121 petitioners' second contention that they have overcome the presumption in favor of respondent's determination of the deficiencies in tax has no merit because respondent has conclusively established a source for the unreported income used in respondent's determinations. 2. Understatement of Income
Respondent's determination that petitioners failed to report all of the income from Mooretown for the years in issue is based upon a comparison of the store's gross receipts as reported on petitioners' returns with their total redemptions of food stamps and WIC vouchers. Hereinbefore, we have discussed and rejected petitioners' contention that Charles Russo owned Mooretown Grocery during 1984, 1985, and 1986 because the objective evidence in the record as a whole clearly rebuts petitioners' argument and establishes that to the extent Charles Russo was involved in the operations of Mooretown during such years, he was acting as the employee or agent of Angelo Russo. Under such circumstances, any income generated by his activity as an agent was reportable on the income tax returns of petitioners. Maryland Casualty Co. v. United States, 251 U.S. 342, 347 (1920); *122 Warren v. United States, 613 F.2d 591, 592-593 (5th Cir. 1980); Fogarty v. United States, 780 F.2d 1005, 1008 (Fed. Cir. 1986). Petitioners further contend that the gross receipts of Mooretown were not understated for three reasons. First, they insist that a daily record of all sales or other receipts of income made at Mooretown was kept by them and that these daily records were used by Max Renov, their accountant, to arrive at the gross receipts reported on their tax returns. Thus, according to petitioners, the gross receipts reported on the Schedules C included all of Mooretown's legal sales as well as the profit from any illegal purchase and redemption of food stamps or WIC vouchers. Here again, the record contains only uncorroborated self-serving testimony by Angelo and Charles Russo on this point and no competent evidence to substantiate petitioners' claim. Furthermore, Max Renov testified that on each of his trips to Mooretown, petitioners merely gave him one figure for gross receipts which he understood represented all receipts for the period by Mooretown. He also testified that he was never aware that the gross receipts figure included *123 any receipts from illegal transactions in food stamps and WIC vouchers. We find the claim by petitioners that the gross receipts figures given to Mr. Renov included illegal receipts from food stamps and WIC vouchers to be unreasonable, improbable, and not worthy of serious consideration. We reach this conclusion because it strains the imagination to believe that petitioners would have maintained accurate contemporaneous records of their receipts from illegal transactions in food stamps and WIC vouchers where it clearly appears from our findings that during the years at issue they were almost constantly under suspicion if not actual investigation by the food stamp and WIC authorities. Petitioners next contend that the difference between their reported gross receipts and their redemptions of food stamps and WIC vouchers is represented by change given to customers making legal purchases. We agree that change in purchases made with food stamps would account for some part of the difference. However, such change would not account for more than an insignificant percentage of the difference because: (1) Change occurred only in transactions involving food stamps and not WIC vouchers; *124 (2) food stamps accounted for only about one-fourth or less of the total redemptions in each year; and (3) change was limited to 99 cents or less in any one transaction. Therefore, under the most favorable inference, change could only account for a small percentage of the discrepancy. Finally, petitioners claim that Michael Cordaro, James Yerby, and perhaps others bought food stamps and WIC vouchers and redeemed them under Mooretown's authorization numbers. The record contains evidence that Michael Cordaro and James Yerby were charged with illegally obtaining food stamps and WIC vouchers which apparently were redeemed with Mooretown's authorization number after being endorsed by Angelo Russo or for Angelo Russo by Charles Russo. Thus, petitioner and Charles Russo clearly used Mooretown's authorization numbers to receive cash for the food stamps and WIC vouchers that others had illegally purchased. However, the record contains no evidence to support a conclusion that Michael Cordaro or James Yerby used Mooretown's authorization numbers in any manner in order to receive cash from illegal transactions in food stamps or WIC vouchers. Since petitioners have failed to shift the burden *125 of going forward with the proof or to overcome the presumption that respondent's determinations of the deficiencies are correct, they have failed to carry their ultimate burden of proving by a preponderance of the evidence that the understatements of income determined by respondent for the years 1984, 1985, and 1986 are erroneous. Petitioners next contend that if understatements of their gross incomes for 1984, 1985, and 1986 are found, they should be permitted to take an offsetting deduction in each year for embezzlement apparently by Charles Russo since they did not receive the funds represented by the understatements. Section 165 permits an individual to deduct a loss by theft including embezzlement incurred in a trade or business and not compensated by insurance or otherwise. Sec. 165(a), (c)(1); sec. 1.165-(8)(d), Income Tax Regs. In order to be deductible, the embezzlement loss must constitute a crime under the laws of the jurisdiction in which the events took place. Weingarten v. Commissioner, 38 T.C. 75, 78 (1962). Louisiana law provides in pertinent part the following definition of theft: Theft is the misappropriation or taking of anything of *126 value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
La. Rev. Stat. Ann. sec. 14:67 (West 1986). This definition includes various stealing crimes including embezzlement. State v. Hoffer, 420 So. 2d 1090, 1092 (La. 1982). Essentially, petitioners argue that if they must include in income the proceeds of the illegal transactions, then they are entitled to deduct a corresponding amount as a theft loss as a result of Charles Russo's embezzlement of those funds. In support of this assertion, the record contains no proof of the following elements which are required under Louisiana law to establish an embezzlement: (1) That Charles Russo or some other party took or misappropriated property belonging to petitioners; (2) that if a misappropriation occurred, it was without petitioners' consent or by means of fraudulent conduct, practices, or representations; and (3) that Charles Russo or such other person acted with an intent *127 to permanently deprive petitioners of their property. Therefore, from the record as a whole, we are unable to conclude that petitioners suffered a deductible embezzlement loss in any year in dispute. 3. Additions to Tax for Fraud
Respondent determined that petitioners are liable under section 6653(b) for additions to tax for fraud for each of the years 1984, 1985, and 1986. Respondent has the burden of proving fraud with clear and convincing evidence. Sec. 7454(a); Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148. In order to meet this burden, respondent must prove that petitioners intended to evade taxes known to be due by conduct designed to conceal, mislead, or otherwise prevent the collection of such taxes by respondent. Patton v. Commissioner, supra at 171. The existence of fraud is a question of fact to be determined from the entire record. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980); Stratton v. Commissioner, 54 T.C. 255, 284 (1970). However, fraud *128 need not be established by direct evidence, but can be shown by an examination of the taxpayer's entire course of conduct and drawing reasonable inferences from such conduct. Patton v. Commissioner, supra at 171. The existence of fraud is often determined from the presence of certain factors referred to as badges of fraud. These factors include: (1) The consistent understatement of income over a period of years; (2) inadequate records; (3) implausible or inconsistent explanations of behavior; (4) concealment of assets; (5) engaging in illegal activities; (6) attempting to conceal illegal activities; and (7) dealing in cash. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. From the record as a whole, we find that respondent has proven the existence of each of the above factors in this case. Petitioners' substantial understatements of income in each of the 3 years in issue resulted in large underpayments of tax. Such consistent understatements are strong evidence of fraud. Patton v. Commissioner, supra at 171. In addition to the consistent understatement *129 of income, petitioners failed to maintain adequate books and records, were engaged in and attempted to conceal illegal activities involving substantial amounts of cash, and in explanation for such conduct, offered implausible and inconsistent statements. We conclude, therefore, that respondent has clearly and convincingly proven that petitioners' income taxes for the years 1984, 1985, and 1986 were fraudulently understated. 4. Additions to Tax Under Section 6661(a)
Section 6661(a) provides for an addition to tax of 25 percent of any underpayment in income tax attributable to a substantial understatement of income tax. An understatement of income tax is substantial if it exceeds the greater of 10 percent of the amount of tax required to be shown on a return or $ 5,000. Sec. 6661(b)(1)(A). An understatement of income tax may be reduced by any item for which the taxpayer had substantial authority for its treatment on the applicable return or for any item which was adequately disclosed on the return or in a statement attached to the return. Sec. 6661(b)(2)(B). Petitioners have the burden of proof with respect to this issue. Rule 142(a). At trial and on brief, petitioners *130 did not contend that they had substantial authority for their treatment of the unreported income received from food stamps and WIC vouchers nor did they assert that they had adequately disclosed these items on their returns or in statements attached to the returns. Thus, if a Rule 155 computation for any year reflects a substantial understatement within the meaning of section 6661(b)(1), the 25-percent addition provided by section 6661(a) will apply. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. An amount equal to 50 percent of the interest payable on the portion of the underpayment attributable to the fraud to the earlier of the date the tax was assessed or paid.↩
2. Unless otherwise specified, all section references are to the Internal Revenue Code of 1954 in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩