JiWALTZER, Judge.

STATEMENT OF THE CASE

On 15 March 1994, the defendant was charged with one count of insurance fraud, a charge to which he pled not guilty. On 14 June 1995, this charge was amended to theft over $500, and he pled not guilty to the amended charge. Trial was held on 12, 14, and 19 September 1995, at the conclusion of which the jury found him guilty as charged. The court noted it would order a PSI and set a bond for the defendant. The court repeatedly reset the case for sentencing. On 27 November 1995, the defendant filed motions for new trial and for post verdict judgment of acquittal, and his amended motion was filed on 3 July 1996. However, for reasons unknown the matter was not heard until 30 April 1998, at which time the court denied the motion for post verdict judgment of acquittal but granted the motion for new trial and indicated it would issue a formal *69 judgment with reasons. The State noted its intent to seek writs and was granted to 29 May to file in this court. However, when the judgment was rendered (it is undated), it instead granted the defendant’s motion for post verdict judgment of acquittal. The State now comes before this court seeking relief from these rulings. On 25 June the State provided the videotapes used at trial. FACTS
On 28 June 1993, Raymond Johnson applied for employment with ETS, a temporary employment service. On his application, he noted a prior back injury in 1991. Johnson was sent to work at the New Orleans Convention Center’s warehouse to work for Andrews Bartlett, a company which prepares |2the center for conventions. On 29th or 30th June[1], Johnson injured his back while lifting a stack of banners which he later estimated weighed 150-200 pounds but which the supervisor of the job estimated weighed approximately twenty pounds. Johnson completed the day’s work by avoiding lifting any other objects. He also worked on 1 July, but insisted he could not work after that day.
On 2 July, ETS sent Johnson to see Dr. Charles Richard, an internist. Johnson told Dr. Richard he had been injured on the job and had stabbing pains in his back. Dr. Richard conducted various tests in his office, took X-rays, and determined that Johnson had a mild lumbar sprain. Dr. Richard found no evidence of muscle spasms. On that occasion, Johnson was carrying a brief ease which Dr. Richard estimated weighed five pounds, and Dr. Richard testified that a person who was unable to work would generally have had trouble carrying this weight, but Johnson appeared to have no trouble carrying it. In any event, Dr. Richard deemed Johnson unable to work and told him to return for a follow-up visit on 6 July. When Johnson returned on that date, Dr. Richard again examined him and found him able to return to work, finding no physical manifestations of his inability to work.
Johnson contacted ETS, which sent him to another job on 12 July. This job, for Links Field Boxes, consisted of assembling boxes and then lifting them onto a pallet. After work on 12 July, Johnson refused to return, telling personnel at ETS that his back pain was so bad that he could not work. Johnson returned to Dr. Richard’s office on 13 July, complaining of continued | aback pain. Dr. Richard testified he conducted routine tests and found no physical reason for the pain. When Dr. Richard indicated Johnson could return to work, Johnson told him he had tried to work and could not because of the pain. Dr. Richard then ordered a CAT scan. The scan, conducted on 21 July, showed some calcification of bone, which Dr. Richard indicated was genetic, and a possible bulge of the disc between the fourth and fifth vertebrae. Johnson visited Dr. Richard on 26 July and 15 August, and each time Dr. Richard could find no reason for Johnson’s pain. Because Dr. Richard believed Johnson could return to work and Johnson insisted he was too injured to return, Dr. Richard referred him to a neurologist.
On 2 September, Johnson visited Dr. Kevin Gorbitt, a neurosurgeon, and told him that he had been injured in June when lifting banners weighing 150-200 pounds. He told Dr. Gorbitt that his pain, which was concentrated on the left side of his back, was “paralyzing and agonizing” and was similar to the pain he experienced from a back injury in 1991. Dr. Gorbitt examined him and found no sign of muscle weakness in his back or legs or any numbness, and Johnson’s reflexes were good. Dr. Gorbitt could feel no muscle spasms. Dr. Gorbitt testified he also did not see any physical manifestations of pain, and in his opinion a “mild posterior bulge on CAT scan by itself is not diagnostic of back pain.” He stated he found no evidence of a lumbar sprain when he examined Johnson. Dr. Gor-bitt testified that approximately twenty per cent of his practice is referred by the Louisiana Workman’s Compensation Corporation.
Ms. Jeannie Storm, a former claims adjuster for LWCC, testified that she handled Johnson’s claim in 1993. She testified a worker must be disabled | ¿for at least seven days in order to collect worker’s compensation benefits. She stated total benefits are two-thirds of full salary based upon salary *70 for four weeks prior to the injury, but in any case the minimum amount of benefits was $82.00 per week. She testified Johnson received the minimum amount because he and his attorney failed to send her any documentation of his prior wages despite her notice to both Johnson and his attorney. She testified Johnson received benefit checks from August until mid-December, 1993, when he was arrested for the instant offense.
Ms. Storm testified she contacted Johnson by telephone on 16 July 1993. During this conversation, which was taped, transcribed, and read to the jury, Johnson told her he had been injured on 30 June when moving a stack of banners weighing approximately 200 pounds. He told her he received a “blinding pain” in his back, and he did no lifting for the rest of the day. He indicated he worked the next day and then did not return to that job. He told her he had seen Dr. Richard, but he was intending to see another doctor because he believed Dr. Richard insulted him and did not take his claim of injury seriously. He stated Dr. Richard initially found him disabled but had determined he could return to work on 7 July. However, due to his continued pain he had refused to return to work that day. He told Ms. Storm he worked at a different job on 12 July, but at the end of the day he could barely walk due to the pain. He indicated this job consisted of box assembly which required him to lift boxes weighing thirty-five to forty pounds. He told Ms. Storm he had not returned to work after that date and that he had told ETS personnel he could not return to work. He mentioned his prior back injury, which hejjindicated kept him from working for about a year, but he insisted he was released to work in January or February, 1992. When asked if he would return to work, Johnson told her: “I don’t know. I tell you — but every time I go back I literally leave away crawling because of the back pain.”
Ms. Storm testified that she spoke with Johnson on 9 August, and he told her he could not stand, sit, or walk for long periods of time due to his pain. When she spoke with Johnson again on 12 August, he indicated his condition had not improved, and he could not work because of the constant pain in his lower back. During their conversation on 17 August, he told her he had not “done anything physical lately.” She testified it was during one of these August conversations that she told him he could increase the amount of his benefit cheek by providing evidence of his prior salary. In response, Johnson sent her a letter alleging certain wages, but neither he nor his attorney sent her any documentation to support this allegation.
Ms. Storm testified she became suspicious and contacted a private investigator in connection with the case. When asked why she did so, she first noted the alleged difference in the weights lifted during the injury, with Johnson insisting the banners weighed 200 pounds, while the supervisor of the job indicated the banners Johnson lifted weighed not more than twenty-five pounds. She also noted the supervisor told her that on the first day of work, Johnson arrived wearing a back brace. She stated Johnson told her he immediately notified his supervisor of the injury, but the supervisor (working for the contractor) did not 'know about the injury, and Johnson did not inform his 16employer (ETS) until a few days after the injury. She also noted his prior back injury, for which she was not sure how long he was treated.
She admitted she would not take later calls from Johnson, but she insisted she did not talk to him because she knew he was represented by counsel by that time, and it was LWCC’s policy to speak only with counsel. She was questioned concerning a telephone deposition she gave in May, 1994, wherein she did not appear to remember some of the information about which she testified at trial. She explained the deposition was taken at her home while she was on maternity leave, and she did not have any files with her at that time. She testified Johnson was representing himself during that deposition. She testified that although she was suspicious and had contacted the investigator, LWCC continued sending Johnson benefit checks because at least one doctor, Dr. Evans, had not released him for work, and until all doctors released him (or charges were filed), LWCC was obligated to issue the checks. However, she refused a request for an MRI because *71 she believed there was no evidence of disability at that time, due to the other doctors’ opinions and the videotapes taken by the private investigators.
An accountant for LWCC testified that entity issued nineteen benefit checks to Johnson, the first on 12 August for $374.86, and the rest every week for $82.00, totalling $1,932.86.
A manager from the Macy’s store in the Esplanade Mall testified Johnson worked for Macy’s as a temporary inventory employee in early June, 1993, for two weeks in October, 1993, and again in January, 1994. She testified his work performance was good. She testified that although the job demanded 17some moving of towels and bedding, mostly the job consisted of moving electronic scanners over merchandise.
Two private investigators hired by LWCC conducted a surveillance of Johnson’s house in August and October, 1993. On each day of the surveillance, the investigator videotaped any outside appearance by Johnson. On 11 August, the investigator arrived at approximately 6:00 a.m. and left soon after 1:00 p.m. During that time, the investigator filmed for one hour and forty minutes, the total time Johnson was outside. The tape of 12 August is only a few minutes long, although the investigator was present for only one less hour. A different investigator watched Johnson’s residence the next two days, and on 13 August only forty minutes of tape was recorded. Nothing was recorded the next day because Johnson did not leave his house during the surveillance. A final short tape of 8 October was shown. Both investigators indicated they only filmed while Johnson was outside his house, and they could not say whether Johnson was resting while inside, or even if Johnson was in pain while performing the work outside the house.
Dissatisfied with Dr. Richard, Johnson consulted Dr. Henry Evans on 22 July 1993. Dr. Evans testified Johnson told him. his injury occurred when he and a co-worker were lifting a bundle of banners weighing 150 to 200 pounds from a height of three to a height of six feet. Johnson told him that during the first lift of the day, he experienced pain in his lower back. He testified he performed light duty for the rest of the day, but he could no longer perform heavy labor. Dr. Evans testified Johnson told him he had attempted to perform work at another location, but this involved lifting thirty-pound boxes onto |8pallets. He told Dr. Evans this work caused him severe pain in his back. He told Dr. Evans of his visits to Dr. Richard and expressed his dissatisfaction with Dr. Richard. Johnson stated his pain was worse in the morning and was aggravated by prolonged sitting. Dr. Evans examined Johnson and found that although he appeared to be able to move with no difficulty, he insisted he was in pain. Dr. Evans found tenderness in the lower back and a noticeable muscle spasm. He diagnosed a lumbar sprain at that time, prescribed medicine, and heat therapy.
Dr. Evans testified that when Johnson returned to his office on 29 July, he indicated he was in more pain. At that time, Dr. Evans noticed more tenderness and some mild limitation of motion in Johnson’s back. He also found muscle spasms in Johnson’s back. By that time he had reviewed Johnson’s CAT scan and had noticed a bulging disc between the fourth and fifth vertebrae, and he diagnosed a lumbar sprain. He also determined Johnson was unable to work. During the. visit on 19 August, Johnson indicated his back was feeling better, and he was able to perform more movements without stiffness or pain. However, there was apparent pain while performing certain bending maneuvers, and there was still tenderness in his lower back. Again, Dr. Evans determined Johnson was unable to work.
During his visit on 2 September, Johnson told Dr. Evans the pains in his back were not as severe but were constant. He told Dr. Evans of his visit with Dr. Gorbitt, who found no neurological problems. Due to continued muscle spasms and tenderness in Johnson’s back, Dr. Evans found him unable to work. At his visit on 15 September visit, Johnson told Dr. Evans his pain had [¡¡increased and had become a “paralyzing pain” which had radiated into his lower pelvic area. Based upon the continued tenderness and spasms in Johnson’s back, Dr. Evans recommended that an MRI be taken. However, this test *72 was not performed because LWCC refused to authorize payment for it.-
Dr. Evans testified Johnson’s pain had worsened by his visit on 6 October, and Dr. Evans prescribed additional pain medication. Dr. Evans testified that at that time he considered' Johnson to be unable to return to heavy labor work. Dr. Evans testified he then saw Johnson on 27 October, 10 November, and 24 November, and his condition remained essentially the same. At his examination on 8 December, Johnson admitted to some improvement, and on that date Dr. Evans cleared him for light duty work. He continued to improve, but by 21 September 1994, he still could not return to heavy duty work.
Dr. Evans testified he reviewed the videotapes made of Johnson by the investigators, and he stated that the activities in which Johnson was seen engaging were not inconsistent with the range of activities to which he had restricted Johnson. Dr. Evans admitted that the videotapes did not appear to show Johnson performing the activities in “paralyzing pain.” He also admitted that pain is many times worse upon arising in the morning and abates somewhat as a person moves around during the day. He also was aware that the videotapes were made during the morning hours. He also pointed out, however, that most of the tapes were made in August, while Johnson did not complain of “paralyzing” pain until his September visit.
lioFour videotapes were shown to the jury. The videotape of 11 August 1998, lasting approximately one hour and forty minutes, first shows Johnson bending over' from the waist to pull a few weeds. He then balanced himself on the hood of a car and positioned and nailed a rather large board over the top of the doorway of the lower portion of his residence, which apparently he used as an office. The tape shows him getting onto and off of the hood of the car without any apparent difficulty. He then nailed a sign onto the board, again balancing on the hood of the car, and a large portion of this nailing again was at a level over his head. During this portion of the tape, Johnson is wearing a back brace. However, the tape shows him taking off the brace after he hung up the sign. Johnson is then seen painting the doorway and the front of the office. The tape shows him bending over from the waist many times in order to reach the paint can, and he is also seen balancing on a kitchen chair in order to reach areas over his head. Again, the tape does not show any difficulty in bending over to reach the paint can or in climbing onto and off of the chair. The only other activity this tape shows is Johnson bending over to pick up some trash on the ground.
The videotape of 12 August, which is approximately four minutes long, shows Johnson picking up something apparently heavy from the back of his car and putting it into a window of the office area. Although the actual object is not seen, he later picked up what looked like the front panel of an air conditioning unit and took it inside the office. The tape shows some effort on his part to lift the heavy object.
| nThe videotape of 13 August, which is approximately thirty minutes long, shows Johnson scraping a little paint around the doorway and the window area of the office. The tape shows Johnson doing some bending activities inside which can be seen through the door. In this tape, Johnson also is seen sweeping and bending over to pick up some trash. Later the tape shows him bending over to clean a paint brush, and then doing a little touch-up painting, bending over at the waist to the ground in order to open and then close the paint can. The tape shows him going behind the stairwell to the second floor, but at some point moving so that the viewer can see him bent over to the ground while cleaning the paint brush.
The videotape of 8 October, which is only a few minutes long, shows him in the parking lot of Macy’s at the Esplanade. In the tape, Johnson has dropped some papers, and he is seen reaching down to retrieve the papers, at one point down on his hands and knees and reaching under a car. The tape then shows him walking across the parking lot and entering a doorway.

DISCUSSION

At the hearing on 30 April 1998, the trial court noted it denied the motion for post *73 verdict judgment of acquittal but was going to grant the motion for new trial. When pressed to say upon what basis it was granting the motion, the court indicated it would issue a written judgment with reasons. However, when the judgment was issued, it instead granted the motion for post verdict judgment of acquittal. Thus, it is difficult to tell exactly what the court’s ruling is. Therefore, it is necessary to discuss the differing standards used to review 112the granting of a motion for post verdict judgment of acquittal and the granting of a motion for new trial where the allegation is the verdict is contrary to the law and evidence.

Granting of Post Verdict Judgment of Acquittal

Although the court initially stated it was denying this motion, the written judgment grants the acquittal. As per La.C.Cr.P. art. 821(B):
A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty.
Subpart D provides that the State may take either a writ or an appeal from the granting of this motion. In State v. Whins, 96-0699, p. 3 (La.App. 4 Cir. 4/9/97), 692 So.2d 1350, 1352-1353[2], this court noted:
Article 821 is the correct vehicle for asserting that the State failed to prove an essential element of the offense. State v. Allen, 440 So.2d 1330 (La.1983). This article tracks the language of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in setting the standard pertaining to motions for post-verdict judgment of acquittal. State v. Smith, 441 So.2d 739 (La.1983); State v. Voorhies, 590 So.2d 776 (La.App. 3d Cir.1991). [footnote omitted]
In its judgment, here the trial court noted the State failed to show the defendant misappropriated the benefits by the means of fraudulent conduct, an essential element of theft, the offense with which he was charged and of which he was convicted.
In State v. Egana, 97-0318 pp. 5-6 (La.App. 4 Cir 12/3/97), 703 So.2d 223, 227-228, this court discussed an appellate court’s review for sufficiency of evidence:
the reviewing court may not disregard [the dictates of Jackson v. Virginia] simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; [State v.] Green [588 So.2d 757 (La.App.4th Cir. 1991)], “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
The defendant was charged with and convicted of theft in the amount of *74 $500.00 or more. The elements of theft are: (1) the misappropriation or taking of anything of value, (2) which belongs to another, (3) with the specific intent | i4to deprive the other permanently of whatever is taken or misappropriated. The taking or misappropriation must be done either without the consent of the owner or by means of fraudulent conduct, practices, or representations. La. R.S. 14:67; State v. Hoffer, 420 So.2d 1090 (La.1982). Here, the State charged the defendant with theft through fraudulent practices, his alleged fraudulent claim for worker’s compensation benefits. In its judgment, the trial court noted it was granting the motion for post verdict judgment of acquittal because it found the State failed to prove that the defendant had engaged in fraudulent practices. The trial court pointed to the testimony of Dr. Evans, who continually found the defendant to be disabled during most of the time alleged in the bill of information, 30 June through 16 December 1993. The trial court acknowledged that the other two physicians involved in the case had already found the defendant was no longer disabled and was able to return to work during most of this period. However, the court noted that Dr. Evans was the only physician to see the defendant during most of this period, and therefore Dr. Evans knew more about the defendant’s true condition. However, if the other two doctors found the defendant no longer disabled, it would stand to reason that he would no longer be consulting them. Thus, the lack of visits to either of the other doctors is not fatal to a finding of sufficiency of the evidence to support the verdict.
The trial court also pointed to Dr. Evans’ testimony concerning the activities seen in the videotapes, wherein he stated that the activities were not inconsistent with the range of activities to which he had restricted the defendant. While most of the activities shown on the tape are not that | i5suspicious, the tapes do contain some greater activities in which the defendant appeared to engage without difficulty and with no apparent pain: the climbing, balancing, and descending of the car hood and the chair on 11 August, and the positioning and nailing of the sign, as well as the bending; the carrying and positioning of the heavy object in the window on 12 August; and the bending on the other two days. As noted by defense counsel at trial, these tapes do not show whether the defendant then had to retire inside the office for rest and pain medication.
The judgment also notes Ms. Storm’s refusal to speak with the defendant at some point concerning his LWCC case. However, Ms. Storm explained that she knew he had counsel at that time and she could only speak with counsel as per LWCC rules. Indeed, the defense never established if these attempts to contact Ms. Storm occurred during the pertinent time period, nor was there any evidence concerning the nature of the information the defendant sought to provide to her. In addition, the court notes that ETS called the defendant and told him that he could no longer work. However, the testimony at the page cited for this statement shows that instead, Ms. Lanterri testified that when she called the defendant concerning his continued employment, the defendant told her he could no longer work.
Likewise, the judgment notes that the fact that the defendant was working during two weeks of the pertinent time period did not rule out his eligibility to receive benefits from LWCC. However, this fact was never established at trial. Indeed, counsel did not seek this information from Ms. Storm, the only witness who would have been able to answer questions concerning eligibility. Instead, | i6counseI questioned LWCC’s accountant about this matter, and the accountant testified he had no knowledge of the rules governing benefit eligibility.
Apparently the trial court granted the motion for post verdict judgment of acquittal because it believed the testimony of Dr. Evans over that of the other two physicians, both of whom found the defendant able to return to work. In so doing, the trial court applied the wrong standard. Indeed, the standard it employed is that used to determine whether to grant a motion for new trial based upon a claim that the evidence is contrary to the law and evidence, which is discussed below. Applying the correct standard, the evidence presented at trial was sufficient to support the jury’s verdict that *75 the defendant committed theft in the amount of $500.00 or more beyond a reasonable doubt. Therefore, the trial court erred by granting the post verdict judgment of acquittal.

Granting of New Trial

At the hearing on 30 April, the trial court noted it was granting the motion for new trial. It did not set forth a basis at that time, and by the time the written judgment was prepared, the motion for post verdict judgment of acquittal had been granted. We must also address the merits of the granting of the motion for new trial. Of the grounds for the granting of a new trial under La. C.Cr.P. art. 851, the only grounds which would be applicable to this case would be: (1) the verdict is contrary to the law and evidence; and (5) the court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right. If the motion was granted on the basis of the “ends of | ^justice,” this ruling is not reviewable. State v. Evans, 27,750 (La.App. 2 Cir. 2/28/96), 669 So.2d 719[3]; State v. Olidge, 575 So.2d 400 (La.App. 4 Cir.1991)[4]; State v. Savoie, 448 So.2d 129 (La.App. 1 Cir.1984)[5]. However, if the motion was granted on the ground that the verdict is contrary to the law and evidence, which considering the actual motion is much more likely, that ruling is reviewable. In considering a motion based on this ground, the trial court must sit as a “thirteenth juror,” reweighing the evidence and determining whether it agrees with the jury’s resolution of the evidence. See Evans; State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517[6]. In considering a motion for new trial under this ground, the trial court has wide discretion in determining the weight of evidence. Evans.
As noted during the discussion above concerning the granting of the post verdict judgment of acquittal, apparently the trial court reweighed the evidence, finding the testimony of Dr. Evans concerning the defendant’s continued disability was more credible than that of the other two physicians who found the defendant was not disabled. It appears the court sat as a “thirteenth juror” and found it did not agree with the jury’s resolution of the evidence. It is unclear if the court abused its discretion by so doing. As noted by the court, Dr. Evans was more familiar with the defendant’s condition during most of the pertinent period because he was the only physician who saw the defendant after the first | 18part of September. In addition, the activities shown in the videotape are not so egregious as to show by themselves that the defendant was not experiencing pain while performing them. Given these factors, the trial court did not abuse its discretion by finding Dr. Evans’ testimony more convincing than that of the other two physicians concerning the defendant’s medical condition during the pertinent time period. Therefore, the court did not err by granting the motion for a new trial.
ACCORDINGLY, the application for writ of certiorari is granted. The Post Verdict Judgment of Acquittal is reversed. The judgment granting a New Trial is affirmed.

APPLICATION FOR WRIT OF CER-TIORARI GRANTED. POST VERDICT JUDGMENT OF ACQUITTAL REVERSED. JUDGMENT GRANTING NEW TRIAL AFFIRMED.

. The date of the injury is given by one witness as 29 June and by another as 30 June.

. Writ den. 97-1227 (La. 11/7/97), 703 So.2d 1263.

. Writ den. 96-0793 (La.6/28/96), 675 So.2d 1119.

. Writ den. 629 So.2d 410 (1993).

. Writ den. 449 So.2d 1345 (1984).

. Writ den. 96-0388 (La.9/13/96), 679 So.2d 102.