PER CURIAM.
 

 LThe state charged defendant by bill of information with theft in an amount over $500 in violation of La.R.S. 14:67. After defendant waived trial by jury, the trial court found him guilty of the lesser included offense of unauthorized use of a movable, La.R.S. 14:68. The trial court sentenced defendant to five years’ imprisonment at hard labor, the maximum term for the offense. On appeal, the Fourth Circuit reversed defendant’s conviction and sentence on grounds that in a dispute arising from a contract to repair and renovate a home in New Orleans following Hurricane Katrina, the state failed to prove the requisite intent to defraud to
 
 *776
 
 support defendant’s conviction for a criminal offense involving the unauthorized use of the victim’s money and that “the dispute that existed between the parties was civil in nature not criminal and should have been handled in a civil proceeding, where any damages owed by either party could be properly assessed under the terms of the contract.”
 
 State v. Greene,
 
 08-1318, p. 10 (La.App. 4th Cir.11/12/09), 26 So.3d 274, 280 (Belsome, J., dissenting). We granted the state’s application to review the decision below and reverse because we agree with Judge Belsome that viewing the evidence in a light most favorable to the prosecution, and giving due deference to the factual findings made by the trial judge in reaching his verdict, the evidence supported the verdict returned by the court.
 

 No significant dispute exists with respect to the essential facts of this case, although the extent to which defendant and Karen Blanks became involved at a personal as well as professional level was sharply contested. Defendant, a self-described contractor, came to New Orleans in March 2006, after friends urged him to take advantage of the opportunities presented by the reconstruction underway in the city following Hurricane Katrina. A mutual friend had given defendant Karen Blanks’s name and after defendant arranged a meeting, and then began a personal relationship with Blanks, discussions turned to reconstructing Blanks’s storm-ravaged home. Blanks testified that defendant represented himself as a licensed contractor in Louisiana, doing business as Grady Greene Construction LLC, and they agreed on a total price of $67,000 for the work. The revised contract was signed on August 14, 2006, on a form supplied by defendant, at the top of which was his letterhead, “Greene General Contractor Services,” next to the statement, “Licensed and Insured LA # R-1344-2005.” Defendant signed as a general contractor, and the agreement spelled out in detail four phases in the repair of the residence. On August 14, 2006, Blanks had an initial payment of $25,200 transferred from her bank to defendant’s account as a deposit on the contract. Two days later, defendant obtained a building permit, but he did not begin work on the home until September 2006, when he parked |aa trailer in front of the house and went about cutting down a tree in the back and removing a damaged fence.
 

 However, in the course of the preliminary work, defendant informed Blanks that the floors were not level, that removal of the fireplaces, as contemplated in Phase II of the contract, was impossible without repairing the foundation first, and that it was pointless to drywall the interior, Phase III of the contract, without first leveling the house. On October 6, 2006, defendant presented Blanks with an estimate of $6,800 to repair the foundation. Blanks obtained estimates from two other contractors, both of whom said the fireplaces could be safely removed without leveling the house. However, in the opinion of one of the contractors, the house was, in fact, “off centered by approximate degree and requires centering,” and that the structural correction “should be accomplished prior to continued work on residence, especially prior to installation of drywall material.” Nevertheless, Blanks testified that the contractor had called to reassure her work could proceed on removing the chimneys, and that she had other work around the house besides hanging drywall she expected defendant to do while she found someone to level the house. Blanks then instructed defendant to remove the fireplaces. Defendant explained that, notwithstanding the opinions of other contractors, removing the
 
 fireplaces
 
 would be dangerous to him and his
 
 *777
 
 crew without prior foundation repair. He also noted he would have to obtain an estimate for the chimney removal, although the removal had been specified in Phase II of the contract, and Blanks, acceding to the plan, instructed him to continue with other tasks in the contract.
 

 However, within a week, Blanks noticed that no other work had been done on the property. She attempted to contact defendant over the next 10 days but was ^unsuccessful. On October 27, 2006, Blanks then delivered to defendant at his residence a letter outlining what was expected of him. Four days later, on October 31, 2006, Blanks confronted defendant at home and informed him he was fired and the contract terminated. Blanks also sent defendant a termination letter by certified mail and demanded to be repaid the outstanding deposit balance within 24 hours, or she would contact the District Attorney’s Office. That same day, Blanks ordered two of defendant’s workers off the property. In her estimation, although defendant had been on the job for two months, he had done “very little work,” beyond removing a fence, cutting down a tree, and removing some wood lathe from the walls, and, from what she could see, “that was all.”
 

 Two weeks after she fired defendant, Blanks made a formal complaint to the Economic Crimes Department of the Orleans Parish District Attorney’s Office. Detective Byron Francois met with defendant on December 6, 2006, and inquired if he had considered repaying Blanks. Defendant acknowledged that he owed Blanks the deposit less $4,800 for work already performed and submitted a written proposal offering to repay Blanks $20,000 at the rate of $5,000 a month beginning on December 31, 2006. Defendant told Francois that he could not repay any faster because he had used Blanks’s money to pay work crews, buy materials, and pay himself on other, unrelated, jobs he was currently working, but also that he could pay Blanks $5,000 by the end of the month.
 

 Francois met with Blanks to determine if defendant’s repayment plan was acceptable; however, Blanks informed Francois that the terms were unacceptable to her. Blanks testified that she needed to receive at least $10,000 per month because she was paying both rent and a mortgage. She also testified that defendant had | ^informed her that he did not “use money from one person’s account to another one to do any construction on any other person’s house.” Thus, “since no work was done on my house,” Blanks saw no reason why defendant could not meet the terms of her demand for repayment, less the amount claimed by defendant for the work performed on the house. With negotiations at a standstill, Detective Francois arrested defendant on December 20, 2006, 11 days before the date of his first proposed payment.
 

 Defendant testified at trial that, in fact, he often worked two jobs simultaneously, but never more than two, that he had apprised Blanks of the practice, and that she had no objection “whatsoever.” According to defendant, out of the original deposit which went into the only bank account he had at the time, he paid his work crew on the Blanks project and also “used those funds for another project that I had going, which is a common practice among contractors, that you have one or two jobs going and that sometimes you commingle funds to cover them, to keep both jobs going. That’s exactly what I did.” Defendant conceded that even after Blanks had fired him at the end of October 2006, he continued to draw $1,500 a week against the Blanks deposit as his own salary in November and December 2006, “de
 
 *778
 
 pending on what [his] personal needs were.” Defendant testified that the other project he had underway during November and December 2006, was for a Herman Sparks, and he identified Defense Exhibit Five, as a check from Sparks to him in the amount of $9,600, which he had “offered to pay to Ms. Blanks during the month of December.” R., Tr., p. 125.
 

 The check from Sparks formed the linchpin of the defense offered at trial that the case was a civil matter to sort out in a good faith dispute over progress on the house which came to an end mid-October 2006, when defendant reported that the | r,structure was not level and that he could not safely remove the chimneys, and certainly could not drywall the interior, until it was leveled. However, at the close of the testimony, the trial court rejected that defense and found defendant guilty of the lesser offense of unauthorized use of a movable. The trial judge did not convict him of theft as originally charged because “the specific intent to permanently] deprive at the outset of this agreement was not in my mind proven beyond a reasonable doubt.” However, the court found “that at some point during the course of the proceedings ... [defendant] clearly used her money by fraudulent means, practice or representations for his own personal gain.”
 

 In reversing the trial court and setting aside defendant’s conviction, the court of appeal majority concluded that “[t]he evidence failed to exclude the reasonable probability that Mr. Greene and Ms. Blanks had a legitimate business dispute as to how best to proceed with the repairs and renovation of Ms. Blank’s [sic] home, and that she terminated Mr. Greene’s services after he was reluctant to proceed in the manner suggested by Ms. Blanks.”
 
 Greene,
 
 08-1318 at 10, 26 So.3d at 280. The majority further observed that
 

 “[l]ending legitimacy to Mr. Greene’s concerns about the condition of the property, one of the contractors that Ms. Blanks consulted confirmed Mr. Greene’s assessment of the need to level the foundation.”
 
 Id.
 
 While acknowledging that defendant’s “actions of applying the money advance by Ms. Blanks to another job or drawing on the money to pay himself, viewed in the light most favorable to the State, could constitute evidence of fraudulent and/or criminal conduct,” the majority noted that the state had not charged defendant with misapplication of payments by a contractor in violation of La.R.S. 14:202, and concluded that “[a] rational trier of fact, viewing the evidence in the light most |7favorable to the prosecution could not find that fraudulent intent was proven beyond a reasonable doubt.”
 
 Greene,
 
 08-1318 at 10-11, 26 So.2d at 280-81. Dissenting, Judge Belsome had no dispute with the majority’s factual account of the circumstances surrounding the dispute, but found that the majority had gone astray because “we are not permitted to substitute our interpretation of the evidence for that of the fact finder.”
 
 Greene,
 
 08-1318, p. 2, 26 So.3d at 282 (Belsome, J., dissenting)(citing
 
 State v. Pigford,
 
 05-0477, p. 6 (La.2/22/06), 922 So.2d 517, 521). On that basis, Judge Belsome would have deferred to the trial court’s finding that defendant “ ‘clearly used [the victim’s] money by fraudulent means, practices or representations for his own personal gain.’ ”
 
 Id.
 

 The majority on the court of appeal panel began with the correct premise but erred for the reasons articulated by Judge Belsome. The crime of unauthorized use of a movable is “the intentional taking or use of a movable which belongs to another, either without the other’s consent, or by means of fraudulent conduct, practices, or representations, but without any intention to deprive the other of the movable permanently.” La.R.S. 14:68. The crime is a
 
 *779
 
 lesser and included offense of theft “because theft includes all the elements of unauthorized use — plus the intent to deprive permanently (instead of only temporarily) the owner of his property.”
 
 State v. Reeves,
 
 342 So.2d 605, 608 (La.1977). The offense of unauthorized use is therefore part of Louisiana’s merger of the traditional common law crimes of larceny, embezzlement, and obtaining by false pretenses.
 
 See
 
 R.S. 14:67, Offl Rev. Cm’t (“This section [defining the offense of theft] has the effect of combining the traditional offenses of larceny, embezzlement, and obtaining by false pretenses.... [TJhere seems to be absolutely no reason why today the fundamental notion that it is |ssocially wrong to take the property of another, in any fashion whatsoever, cannot be stated ... clearly and simply....”). The offense is principally aimed at the unauthorized use of automobiles (i
 
 e.,
 
 “joyriding”).
 
 State v. Gisclair,
 
 382 So.2d 914, 916 (La.1980)(“It is clear that the choice of the term ‘movables’ in the statute was due to the lack of another term to describe the tangible objects covered under prior laws
 
 [e.g.
 
 using animal of another, automobile of another, milking cow of another].”). However, money is a corporeal moveable, capable of being taken or used in an unauthorized manner.
 
 State v. Anderson,
 
 07-0752, p. 6 (La.App. 5th Cir.2/6/08), 979 So.2d 566, 570. As with the greater offense of theft, the crime of unauthorized use requires the taking of the property of “another,” and we have construed the statute to require a showing of mens rea or criminal intent, “since the ‘evil’ state of mind of the actor normally distinguishes criminal acts (punishable by the state alone) from mere civil wrongs (actionable by private individuals against one another).”
 
 State v. Bias,
 
 400 So.2d 650, 652-53 (La.1981). The state may present direct or circumstantial evidence of fraudulent intent,
 
 Bias,
 
 400 So.2d at 652, and in cases of circumstantial evidence, when the fact finder “reasonably rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.”
 
 State v. Captville,
 
 448 So.2d 676, 680 (La.1984).
 

 In the present case, the court of appeal majority found, in effect, that the trial court did not act reasonably in rejecting the defendant’s hypothesis of innocence that the dispute with Ms. Blanks over repayment of the deposit money was simply a matter for the civil courts to sort out and not for the criminal courts. However, the evidence at trial left no question that defendant misrepresented himself at the outset |nof his relationship with Blanks by holding himself out as a licensed contractor in Louisiana. The state called Carl Bourque, a Residential Compliance Supervisor for the State Licensing Board for Contractors, to establish that defendant was not, in fact, registered with the Board as a home improvement contractor and had never applied for a license. Defendant made no effort to rebut Bourque’s testimony. Thus, although the contract prepared by defendant conformed to the specific requirements for such agreements when they are for an amount of more than $7,500 or more, La.R.S. 37:2175.1(A)(“Ev-ery agreement to perform home improvement contracting services, as defined by this Part, in an amount in excess of seventy-five hundred dollars [but not in excess of seventy-five thousand dollars]
 
 [1]
 
 shall be in writing and shall include_”), Louisi
 
 *780
 
 ana law prohibited defendant from entering into the contract in the first place because “[n]o person shall undertake, offer to undertake, or agree to perform home improvement contracting services unless registered with and approved by the Residential Building Contractors Subcommittee of the State Licensing Board for Contractors as a home improvement contractor.” La.R.S. 37:2175.2(A). Louisiana law also precluded defendant from “[ojperating without a certifícate of registration issued by the subcommittee,” La. R.S. 37:2175.3(A)(1), and from “[mjaking any material misrepresentation in the procurement of a contract or making any false promise likely to influence, persuade, or induce the procurement of a contract,” La.R.S. 37:2175.3(A)(4), or “[mjaking a false representation that the person is a state licensed general contractor.” La. R.S. 37:2175.3(A)(8);
 
 cf.
 
 La.R.S. 14:202.1(A)(2)(the offense of home improvement fraud is committed when,
 
 inter alia,
 
 a contractor or his agent or employee uses “any deception, false pretense, or false promise to cause any |inperson to enter into a contract for home improvements.”).
 
 [2]
 
 The purpose of the licensing requirements for contractors in Louisiana generally “is the protection of the health, safety, and general welfare of all those persons dealing with persons engaging in the contracting vocation, and the affording of such persons of an effective and practical protection against the incompetent, inexperienced, unlawful, and fraudulent acts of contractors with whom they contract.” La.R.S. 37:2150.
 
 [3]
 

 Given defendant’s initial misrepresentations to Blanks, we need not address his claim that industry practice did not preclude him from commingling funds from several ongoing projects in a single bank account, thereby permitting him to use funds from one project on another project with or without the knowledge or consent of the owners. Similar claims have been made in other cases,
 
 see, e.g., State v. Ferrari,
 
 398 So.2d 804, 808 (Fla.1981)(up-holding statute prohibiting fraudulent misapplication of contract funds by a building contractor against the argument,
 
 inter alia,
 
 that “the cash flow realities of the construction business frequently mandate that a contractor engaged in numerous projects use funds advanced for one job to pay subcontractors or suppliers on another .... it is common practice for a contractor to use incoming funds to discharge his most pressing obligations and replace them later with the proceeds of other jobs.”), and the jurisprudence has distinguished between a contractor’s conversion to his own use of unrestricted advance payments, and theJjjconversion of an advance payment earmarked for a specific construction purpose,
 
 e.g.,
 
 purchase of lumber or other building materials.
 
 See
 
 3 Wayne R. LaFave,
 
 Substantive Criminal Law,
 
 § 19.6(d), pp. 103-04 (2nd ed. 2003)(Because the property converted must belong to “another,” one who bor
 
 *781
 
 rows money and then converts the borrowed sum to his own use is not guilty of embezzlement, even though, when the time comes to repay the loan, he is unable to do so.... So too a building contractor who receives from the landowner an advance payment on the contract and who thereafter spends the money for his own purposes and does not fulfill the contract, is not guilty of embezzlement, unless the money is earmarked to be used only for a construction purpose.”)(footnotes omitted);
 
 People v. Parker,
 
 235 Cal.App.2d 100, 108, 44 Cal.Rptr. 909, 914 (1965)(defendant, a residential developer, committed theft by embezzlement when he took payments from home buyers for the specific restricted purpose of delivering the money to a title company and converted it to his own use in his building firms);
 
 State v. Joy,
 
 121 Wash.2d 333, 851 P.2d 654 (1993) (affirming counts of theft by embezzlement involving contractor’s conversion to his own use of advance payments intended to purchase specific materials such as cabinets but reversing theft convictions on counts involving contractor’s conversion of advance payments not earmarked for any specific construction purpose).
 

 However, whatever the common practice in the industry, it cannot include misrepresentations with regard to state licensing requirements which go beyond mere “puffing” in contract negotiations,
 
 Pizza Hut, Inc. v. Papa John's Intern., Inc.,
 
 227 F.3d 489, 496 (5th Cir.2000)(discussing various definitions of “puffing,” or exaggerated claims made by a seller that no reasonable buyer would take seriously), 112and constitute material misrepresentations in violation of state law intended to protect Louisiana homeowners against incompetence and fraud.
 
 Cf. United States v. New South Farm & H. Co.,
 
 241 U.S. 64, 36 S.Ct. 505, 507, 60 L.Ed. 890 (1916)(“[W]hen a proposed seller ... assigns to the article qualities which it does not possess ... but invents advantages and falsely asserts their existence, he transcends the limits of ‘puffing’ and engages in false representations and pretenses.”). On the evidence presented at trial, any rational trier of fact could find that defendant took the advance payment on the contract from Ms. Blanks by fraudulently representing himself as a licensed general contractor in Louisiana, and by that act alone, committed the offense of unauthorized use of a movable in violation of La. R.S. 14:68, when he took the $25,000 deposit from her. Moreover, as the trial court noted in its reasons for judgment, nothing in what then transpired undercut the inference of fraudulent intent arising from defendant’s initial misrepresentations. By defendant’s own accounting, he continued to draw on Blanks’s advance money in November and December, depending on what his personal needs were, until he had completely depleted the advance, although he had performed relatively little work on the house, she had fired him at the end of October, demanded the rest of her deposit back, and threatened to take legal action. The court of appeal majority acknowledged that defendant’s testimony on this point, viewed in a light most favorable to the state,
 
 could
 
 constitute evidence of fraud. In fact, the trial court reasonably found that it
 
 was
 
 evidence of fraudulent intent when it returned its verdict.
 

 Under these circumstances, as noted by Judge Belsome in his dissent, it was not appropriate for the court of appeal majority to substitute its own appreciation of what the evidence at trial did or did not prove for that of the fact finder.
 
 State v. Robertson,
 
 96-1048, p. 1 (La.10/4/96), 680 So.2d 1165;
 
 State v. Lubrano,
 
 563 So.2d 847, 850 (La.1990). Defendant may or may not have also violated La.R.S. 14:202 (misapplication of payments to material-
 
 *782
 
 men), although no evidence in the record suggests that he failed to pay his work crew while paying himself, and there were evidently no materialmen to satisfy because so little work was done on the house. However, the state in any event had plenary discretion to decide how and under what statute it would proceed. La.R.S. 14:4(l)(prosecution may proceed under either provision, in the discretion of the district attorney, when the offender’s conduct is “[criminal according to a general article of this Code ... and also according to a special article of this Code....”). The state’s choice to charge defendant with the crime of felony theft, encompassing the lesser included felony offense of unauthorized use, reflected the significant, and for all that appears permanent, economic loss incurred by Ms. Blanks.
 

 Accordingly, the decision below is reversed, the defendant’s conviction and sentence are affirmed, and this case is remanded to the district court for purposes of execution of sentence.
 

 COURT OF APPEAL DECISION REVERSED; CONVICTION AND SENTENCE REINSTATED; CASE REMANDED
 

 [1]
 

 . The bracketed language was added by 2007 La. Acts 398, which made no other significant change in the statute.
 

 [2]
 

 . However, this statute, enacted by 2008 La. Acts 292, was not in effect at the time of the acts charged against defendant in the present case.
 

 [3]
 

 . As part of this regulatory scheme, La.R.S. 37:2175.4 provides administrative penalties for any contractor who is registered, or is required to be registered, for any violation of the provisions relating to home improvement contracting. The penalties may amount to 25% of the total contract price. Bourque testified that defendant had, in fact, been assessed the maximum 25% penalty on the total contract price of $67,000, plus the costs of the administrative hearing leading to that penalty. However, when defense counsel objected as to the relevancy of that part of the supervisor’s testimony, the trial judge sustained the objection and ruled that it would not take evidence of the administrative action into account in reaching a verdict.