PAUL A. BONIN, Judge.
| dayman Frost appeals his conviction for theft, a violation of La. R.S. 14:67 A. Because the amount taken is $500 or more, the conviction is a felony. See La. R.S. 14:67 B(2) and 14:2 A(4). In his sole assignment of error on appeal, he argues that under the well-known Jackson v. Virginia standard the evidence at trial was insufficient to prove to any rational fact- *1077 finder his guilt as to each and every element of the offense of theft. Mr. Frost, working as a home-repair contractor, argues with emphasis that his actions showed he had no intent to permanently deprive the victim of her money at the time he took the money.
Because we conclude that La. R.S. 14:67 does not provide as an essential element of the offense that the intent to permanently deprive must be contemporaneous with or coincidental to the initial taking and that, under the Jackson v. Virginia standard, there is sufficient evidence for a rational trier of fact |2to find guilt upon proof beyond a reasonable doubt as to every essential element of the crime of theft, we affirm Mr. Frost’s conviction and sentence.[1]
I
Mr. Frost’s theft charge arises from the construction contracts that he, while doing business as Sunrise Builders of Louisiana L.L.C., entered into with Elaine Robertson in February and October of 2008 to rebuild her home, which had been damaged by Hurricane Katrina.
Under the February 2008 contract, Mr. Frost undertook to level the house, replace rotten wood, replace floors where necessary, replace the roof, install siding on the entire house, and build a six-foot addition for $49,200.00. The written contract provided for payments in three installments: 50% to start, 25% when work was half done, and 25% upon completion. The parties, however, verbally agreed to a different payment schedule. At trial, Ms. Robertson testified that Mr. Frost asked for $15,000.00 to start the project and that the other payments would be requested by him as needed. Ms. Robertson paid the initial $15,000.00 in February and made two additional payments of $5,000.00 each in March and April 2008.[2]
Ms. Robertson testified that from February 2008 to June 2009, Mr. Frost performed very little work, and she continuously attempted to contact him fregar ding the lack of work completed on her property. Ms. Robertson testified that Mr. Frost worked on her house for only about one month, which included putting up black tar paper and boarding windows and doors with plywood. But Ms. Robertson stated that no additional work was performed on her home after Mr. Frost received the $5,000.00 check in March of 2008. Specifically, Ms. Robertson testified that Mr. Frost failed to: replace her roof, install sheetrock, work on the floors, and install new siding. And at one point Ms. Robertson observed rain water pouring into her home. Ms. Robertson also testified that instead of working on her house, Mr. Frost and his workers worked on his church.
When Ms. Robertson was finally able to reach Mr. Frost about the condition of her house, Mr. Frost stated that he could not put a roof on her home until she paid him for the addition. As a result, in October of 2008, Ms. Robertson entered into a second contract with Mr. Frost to build an exten *1078 sion to her home for $3,300.00. In connection with this agreement, Ms. Robertson paid Mr. Frost $1,500.00 on October 23, 2008. On October 28, 2008, Ms. Robertson issued Mr. Frost an additional check in the amount of $800.00 to remove debris from the front of her home. Ms. Robertson testified, however, that a roof was never installed and no further work was performed on her property. She also had to pay another company $1,000.00 to remove the debris and trash that Mr. Frost failed to remove.
|4Photographs depicting the condition of Ms. Robertson’s home were introduced by the State and identified by Ms. Robertson.[3] The checks Ms. Robertson wrote Mr. Frost were also introduced into evidence.
On November 15, 2008, Mr. Frost was hospitalized due to a heart attack. Ms. Robertson testified she learned of his heart attack when she called Mr. Frost’s home and spoke with his wife. Ms. Robertson stated that she called Mr. Frost at the hospital to pray with him and sent him two cards, but she never heard back from him.
After not hearing from Mr. Frost for approximately five months, in April of 2009, Ms. Robertson hired another contractor and contacted Mr. Frost to inform him that his services were no longer needed and that he should pick up his tools. On June 1, 2009, Ms. Robertson sent a letter to Mr. Frost expressing her dissatisfaction and asking him to return her money.
The only defense witness was Vincent Clark, who has worked for Mr. Frost refurbishing houses since 2004. Mr. Clark testified that he intermittently worked on Ms. Robertson’s property with two other men from February to April 2008. Mr. Clark stated that during this time, he and the other workers fixed a wall on the side of the house that was about to collapse, replaced old studs, and tore out a few walls and a ceiling. Mr. Clark testified that Mr. Frost paid him by the hour in cash on a weekly basis.
|sMr. Clark testified that after he stopped working on the Robertson home, he worked other jobs for Mr. Frost, including a building across from Mr. Frost’s church, and was paid for those jobs. He also stated he returned to work on Ms. Robertson’s home in September and put black tar paper on the roof, but did not complete working on the roof because of Mr. Frost’s heart attack in November.
II
The standard of review for sufficiency of evidence applicable to criminal convictions in state courts is set out in Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): “After [In re ] Winship [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ] the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.” “But this inquiry does not require a court to ‘ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.’ ” Id., quoting Woodby v. INS, 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (emphasis added by Jackson). “Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond *1079 a reasonable doubt.” Id. (emphasis in original); see also Johnson v. Louisiana, 406 U.S. 356, 362, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (“Jury verdicts finding guilty beyond a reasonable doubt are regularly sustained even | (¡though the evidence was such that the jury would have been justified in having a reasonable doubt.”).
In discharging our review function, we consider “all of the evidence ” before the actual fact-finder. Jackson, 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original). The United States Supreme Court has explained that the standard of review for sufficiency of evidence is highly deferential to the fact-finder because it “gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.” Id. “The criterion thus impinges upon jury’ discretion only to the extent necessary to guarantee the fundamental protection of due process of law.” Id.
Similarly, “[a] reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the Jackson standard of review.” State v. Macon, 06-481, p. 8 (La.6/1/07), 957 So.2d 1280, 1285-1286. “It is not the function of an appellate court to assess credibility or re-weigh the evidence.” Id. The Due Process Clause of the Fourteenth Amendment, the source of the Jackson standard, does not countenance, much less require, that we re-weigh testimony and witness credibility. And “[i]n criminal cases [an appellate court’s] appellate jurisdiction extends only to questions of law.” La. Const, art. V, § 10(B). See also State v. Barthelemy, 09-0391, p. 24 (La.App. 4 Cir. 2/24/10), 32 So.3d 999, 1015.
17Therefore, in discharging our review function for sufficiency of evidence, we cannot re-weigh or re-consider reasonable inferences drawn from basic facts to ultimate facts. We must confine ourselves to questions of law except to the extent, and only to the extent, that Jackson mandates otherwise. State v. Gilmore, 10-0059, p. 5 (La.App. 4 Cir. 10/6/10), 50 So.3d 208, 212.
The jury’s finding that Mr. Frost misappropriated money from Ms. Robertson, therefore, will not be overturned unless we, after reviewing all facts and inferences made by the jury in a light most favorable to the prosecution, find that the facts do not reasonably support a finding of guilt beyond a reasonable doubt.
Ill
In this Part we address Mr. Frost’s allegation that “the State failed to prove that Mr. Frost took the money from the homeowner without her consent or by means of fraudulent conduct or representations.”
Mr. Frost was convicted under La. R.S. 14:67, which provided, at the time of the alleged offense:
A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
B. (1) Whoever commits the crime of theft when the misappropriation or taking amounts to a value of five hundred dollars or more shall be imprisoned, with or without hard labor, for not more than ten years, or may be fined not more than three thousand dollars, or both.
LAs stated in part A “intent” is an essential element of the crime of theft. Mr. *1080 Frost’s challenge that the timing of the intent element must coincide with the actual taking of possession of the property stolen, however, fails to recognize the broad language of the statute under which Mr. Frost was convicted. La. R.S. 14:67 is not limited exclusively to situations in which a defendant has the intent to defraud at the time he takes possession but includes a defendant’s “misappropriation” by fraudulent conduct of what is already in his possession.
The “theft” statute, La. R.S. 14:67, was changed specifically to include “embezzlement.”
The statute combines the common law crime of larceny with the offense of embezzlement. ... “This was accomplished by the elimination of the element of common law larceny known as a ‘trespass in the taking,’ or ‘taking out of the owner’s possession.’ ”
State v. Hayes, 01-3193, p. 4 (La.1/28/03), 837 So.2d 1195, 1197, quoting Rptr.’s Cmt. to La. R.S. 14:67. Embezzlement, unlike larceny, is a fiduciary’s conversion of property that was entrusted to him because of his status as a fiduciary. See id. “Embezzlement differs from larceny in that the original taking is lawful.” Id., quoting Clark & Marshall, A Treatise on the Law of Crimes, § 12.19, p. 903 (7th ed.1967). “The gravamen of the offense is the subsequent felonious conversion of the property with the intent to convert it to the accused’s own use.” Id. “In the offense of embezzlement, the felonious conversion or misappropriation takes place after the lawful receipt of the goods or property by the accused in the course of a fiduciary relationship with the victim that he then breaches in the act of | ¡¡conversion.” Hayes, 01-3193, p. 5, 837 So.2d at 1198 (emphasis in original). “The intent to deprive the owner of his property permanently therefore need not coincide with the actual taking.” Id.
The Supreme Court in Hayes took for granted the fact that the intent to steal could be formed after the actual taking of possession; the primary issue for the court was whether the appropriate venue should be where the defendant formed such an intent, where he took possession of the property that was later misappropriated, or where the defendant had a duty to deliver the property he misappropriated. The Supreme Court cited State v. Cason, 198 La. 828, 5 So.2d 121, 123 (1941), which held that venue was appropriate only at the place of the misappropriation, but that there is a rebuttable presumption that the misappropriation took place “either where the money was entrusted to the accused or at the place at which an accounting is to be made.” The Hayes court ultimately found that venue was appropriate where the defendant should have delivered the money and items, even though that was neither the location of the taking of possession nor the place where the defendant formed his intent to steal. See Hayes, 01-3193, p. 7, 837 So.2d at 1199. Hayes, therefore, clearly stands for the position that a defendant can form an intent to steal after taking possession of property through honest means.
Even before the legislature formally combined larceny and embezzlement as the same statutory offense, the two offenses were not mutually exclusive. In State v. Pellerin, 118 La. 547, 43 So. 159 (1907), the defendant argued that he had been charged Imwith “larceny” but had been illegally convicted of “embezzlement.” The Supreme Court found that the defendant’s proposed distinction between “embezzlement” and “larceny” was inconsequential: *1081 the indictment.... The proposition advanced by the defense that if the defendant under the allegations of the indictment, and under the evidence, had made himself criminally liable for larceny, he could not legally be found liable for embezzlement, is not sustainable.
*1080 What he complains of is not the indictment, but the verdict of the jury under
*1081 Pellerin, 43 So. at 161. Embezzlement “is a broader term than ‘larceny’ under our law, but not exclusive of it.” Pellerin, 43 So. at 161. Because embezzlement has since been incorporated into La. R.S. 14:67, the timing of a defendant’s intent to deprive permanently is inconsequential, and the inquiry into that intent should focus only on whether such an intent was actually formed.
Mr. Frost’s actions of avoiding contact with Ms. Robertson, ceasing work on her house, and not repaying the money he took from her all can be construed by a reasonable fact-finder as evidence of his intent to deprive her of the money permanently.
IV
In this Part, we review the merit of Mr. Frost’s cited case history in support of his position that the timing of the formation of intent necessarily must coincide with the taking possession of property to constitute “theft.”
Mr. Frost cites State v. Saucier, 485 So.2d 584 (La.App. 4th Cir.1986), for the position that a conviction should be overturned if the intent to steal does not In coincide with the actual taking of possession. In that ease Ms. Saucier, pursuant to a written contract, took possession of Mr. McLoughlin’s male dog for the purpose of mating it with her female dog. See Saucier, 485 So.2d at 585. Mr. McLough-lin was to receive one puppy from the resulting litter as payment; however, no puppies were produced. See id. After it was apparent that no puppies would be produced, Ms. Saucier agreed to purchase the male dog for cash, but she neither paid the purchase price nor returned the dog.[4] See id. The district court convicted her of attempted theft of property valued at under $100.00 for failing to pay for the dog. See id. This court reversed, holding that “the State has failed to prove defendant’s requisite criminal intent on August 2, 1982[, the date she took possession of the dog,] as charged in the Bill of Information. Saucier’s attempt to breed the dogs as promised negates a specific criminal intent.” Saucier, 485 So.2d at 586.
Saucier is, of course, a very different case factually. In Saucier, the court reviewed a defendant’s intent behind retaining possession of a pet worth less than $100.00; whereas here, we deal with the intent behind not repaying $27,300.00 in currency.
Mr. Frost and the court in Saucier both relied on State v. Hoffer, 420 So.2d 1090 (La.1982), and on dicta from State v. Robinson, 463 So.2d 663 (LaApp. 4th Cir. 1985), for the position that any attempt to fulfill a contract negates the criminal intent necessary for a theft conviction; therefore, there is insufficient evidence for a conviction when a defendant can show that anything was done. 112This statement, however, is not a reasonable interpretation of Robinson and Hoffer, as we explain next.
The facts of Robinson are as follows: Mr. Robinson did not have a license to practice law; however, he represented to Mrs. Norman, the victim, that he was an attorney and that, for the modest fee of $500.00, he would secure a transfer of her *1082 son out of the Louisiana State Penitentiary in Angola, have him moved to a satellite prison, and later have him placed in a work release program. Mrs. Norman paid Mr. Robinson his requested fee. This court found evidence for Mr. Robinson’s conviction Insufficient and reversed the conviction because the State had made no effort to show that Mr. Robinson had not in fact attempted to uphold his end of the agreement. Robinson, 463 So.2d at 665. This court held, “Because this case is based on circumstantial evidence, this conviction must be reversed because the State failed to eliminate every reasonable hypothesis of innocence.” Id. It was, therefore, improper for the trial court to focus only upon the defendant’s initial misrepresentation as proof of his intent to defraud the victim without further inquiry into whether he actually made a good faith effort to perform his obligations under the contract.
Had Saucier closely followed Robinson, the court would have stated that they could not rely completely on the initial good faith or bad faith, but should instead focus on whether the defendant has actually attempted to perform his obligations set forth in the contract. The Saucier court, however, stated its reliance on Robinson as follows: “In reversing the conviction in Robinson, we stated that if 11sthe defendant had made any effort at all to obtain the promised transfer then his actions would not fall within the theft statute.” Saucier, 485 So.2d at 586, citing Robinson, 463 So.2d at 665. While an accurate representation of the Robinson court’s statement, that statement was not the holding of the court, and it was not the issue the court was deciding. The statement was made after the court already concluded that the State had failed to present sufficient evidence of Mr. Robinson’s failure to perform legal work for Mrs. Norman. Id. The court may have said that “any effort”
would have been sufficient; however, because they were not presented with a factual scenario in which very little work had been done, such a statement is not the holding of the court and should not be the basis for reasoning future decisions.
Hoffer, supra, the case primarily relied upon by both previously cited cases, also overturned a conviction because of insufficiency of the evidence. One of the defendant’s arguments was that the intent to deprive permanently must exist at the time of taking. The Supreme Court, however, entered no discussion of temporal restrictions on a defendant’s formation of his intent, nor did it rely on such a position for its holding. It held simply that the State failed to exclude every reasonable hypothesis of the defendant’s innocence. Specifically, the hypothesis the State failed to exclude is that Mr. Hoffer intended to repay his debts, which is evidenced by his repayment of three of his fourteen debts. See Hoffer, 420 So.2d at 1093.
|14In Hoffer the defendant misrepresented his status as a licensed and bonded automobile dealer in order to purchase fourteen cars at an auction. Afterwards, the defendant sold three of the cars and used proceeds from those sales to pay corresponding bank drafts. The remaining eleven bank drafts, however, were returned unpaid. The defendant argued that his misrepresentation of his status cannot be used as evidence to prove that he never intended to pay for the cars. The Supreme Court agreed:
[W]hile the misrepresentation may have an effect on the perception that the defendant had a greater ability to pay the drafts, it had no bearing on his intent to pay the drafts. Otherwise, it would be saying, for example, that someone buying wholesale without a retailer’s certificate intends not to pay for the mer *1083 chandise. There is no rational relation between the status as purchaser and the intention to pay. With no evidence before it to support the proposition, no rational trier of fact could conclude that the misrepresentation that the defendant was a licensed and bonded dealer indicated an intention not to honor the drafts when presented.
Hoffer, 420 So.2d at 1093. The Supreme Court, therefore, authorized overturning a conviction on the grounds of insufficient evidence when the State attempts to use only a defendant’s initial misrepresentation, and not his subsequent actions, as evidence of the defendant’s intent to commit theft.[5] Conversely, Mr. Frost may have made no misrepresentations at the outset, but his subsequent conduct evidences an intent to misappropriate the money he was paid.
[^DECREE
Reviewing Mr. Frost’s actions as a whole, we find that a reasonable fact-finder could have found that he intended to deprive Ms. Robertson of her money permanently. We, therefore, affirm Mr. Frost’s conviction.
AFFIRMED

. We have reviewed the record for errors patent and have detected none. See La. C.Cr.P. art. 920(2). Mr. Frost was sentenced to ten years at hard labor in the DOC. Mr. Frost's sentence was suspended, and he was placed on five years active probation under the special condition that he make restitution in the amount of $27,300. The defendant did not appeal any aspect of his sentence.

. The record shows that Ms. Robertson paid the $15,000.00 down payment by two checks, $5,000.00 on February 5, 2008 and $10,000.00 on February 14, 2008. The record further shows that Ms. Robertson gave Defendant an additional $5,000.00 on March 13, 2008, $5,000 on April 13, 2008, $1,500 on October 23, 2008, and $800 on October 28, 2008. All checks were made payable to Mr. Frost personally.

. Ms. Robertson testified that the pictures were taken after November 2008.

. It is unclear from the facts as stated whether there was one agreement that included the option to purchase the dog or if that was a later contract.

. More recent Supreme Court decisions dealing with contractor fraud have not placed such a focus on the criminal intent of a defendant aside from his original misrepresentation of his status as a licensed contractor. See, e.g., State v. Greene, 09-2723 (La.1/19/11), 55 So.3d 775, where the contractor's misrepresentation of his status as a licensed contractor was taken as evidence of his intent not to perform all of the work set forth in his contract.