ROSEMARY LEDET, Judge.
hln this criminal case, the defendant, Gerald Biddy, Jr., appeals his conviction and sentence. For the reasons that follow, we affirm his conviction, but we remand to the district court for it to rule on Mr. Biddy’s outstanding motion to reconsider sentence.

STATEMENT OF THE CASE

On July 18, 2011, Gerald Biddy was charged by bill of information with one count of theft of over $1,500.00 in violation of La. R.S. UfflCBM)-[1] On July 25, 2011, Mr. Biddy was arraigned and entered a *771 plea of not guilty. At this time, the trial judge informed Mr. Biddy of his right to select either a jury trial or a bench trial. On September 14, 2011, the district court found probable cause to substantiate the charges and set the matter for trial. On October 18, 2011, Mr. Biddy filed a written notice of election of a bench trial. On March 19, 2012, the 1 gtrial was held. The minute entry states that after the trial court advised Mr. Biddy of his right to select a jury or a bench trial, Mr. Biddy selected a bench trial. The trial judge found Mr. Biddy guilty as charged and set the matter for sentencing.
On April 25, 2012, the trial judge sentenced Mr. Biddy to serve five years at hard labor with credit for time served. On that same date, Mr. Biddy filed an oral motion to reconsider the sentence. This appeal followed. The record on appeal reflects that Mr. Biddy’s motion to reconsider sentence remains outstanding.

STATEMENT OF THE FACTS

The theft charge arises from a construction contract, dated July 3, 2007, between Mr. Biddy and the victim, Rosemary Cold-man (the “Contract”). The Contract provided for Mr. Biddy to perform work on Ms. Coldman’s Hurricane Katrina-damaged home. Before entering into the Contract, Ms. Coldman met with Mr. Biddy to discuss the details and the prices that he would charge for performing the work. At the meeting, Mr. Biddy brought an illustration of the proposed construction for the property and a draw schedule. The draw schedule outlined the work to be performed and estimated the amount Mr. Biddy would be paid at various phases in construction. Shortly thereafter, on June 15, 2007, Ms. Coldman wrote Mr. Biddy a check for $500.00 as a retainer fee and for design and paperwork for the layout of the house.
On July 3, 2007, Ms. Coldman and Mr. Biddy entered into the Contract. Under the Contract, Mr. Biddy agreed to provide architectural and engineering plans, complete the foundation, build the shell (exterior) of the house, install plumbing, and paint the exterior of the house. The total price for the work was $83,880.00. The Contract provided that the work would begin on July 16, 2007, and be completed by October 16, 2007. On the day the Contract was executed, |sMs. Coldman wrote a second check to Mr. Biddy for $10,065.60 — for eighty percent of the work that was to be performed on the foundation.
On July 6, 2007, Ms. Coldman wrote two more checks to Mr. Biddy in the amounts of $2,400.00 (for the installation of ground plumbing) and $3,100.00 (for the balance owed for the architectural and engineering design plans). The total payments that Ms. Coldman made to Mr. Biddy, by the four checks, was $16,065.60.
On August 7, 2007, Ms. Coldman executed a document authorizing Mr. Biddy to act as her agent to obtain the necessary permits to construct her home while she was away on vacation. She testified that, to her knowledge, Mr. Biddy never obtained the requisite paperwork or permits. When Ms. Coldman returned from her vacation in mid-September 2007, she drove by her property and discovered that no work had been performed. Ms. Coldman took photographs of the condition of her property, which showed that the foundation slab remained on her property. Cin-derblocks were set out on her lot near the existing foundation. Ms. Coldman stated that she was expecting when she came back from vacation to find more than just cinderblocks on her property; indeed, she was expecting to see her house substantially completed.
*772 Thereafter, Ms. Coldman attempted to contact Mr. Biddy by phone; however, he never answered her calls. Despite leaving several messages, Mr. Biddy never returned her calls. On October 16, 2007, after approximately three weeks of unre-turned messages, Ms. Coldman emailed Mr. Biddy. In her email, she requested that he return her money and any paperwork he obtained in her name from City Hall. She threatened to go to the district attorney’s office and to sue him for breach of contract. Two days later, Mr. Biddy responded to the email. In his l4response, he indicated that the delay in construction was due to ongoing negotiations with plumbers, a change order, and his knee surgery.[2]
According to Ms. Coldman, a mutual acquaintance, “Mr. Landry”, ran into Mr. Biddy at a local restaurant, a Church’s Chicken. Mr. Landry arranged for a meeting at his house between Ms. Coleman and Mr. Biddy.[3] Ms. Coldman testified that Mr. Biddy never showed up for the meeting.
On November 19, 2007, Ms. Coldman sent Mr. Biddy a registered letter, which stated:
Mr. Biddy Jr. I have been calling you since October 19, 2007 concerning my property. The last time we talked you needed a plumber to go cap off the water, I got one for you. He faxed you a price you never got back to him about doing the work. I have a copy of the fax he sent to you with a price, so I know he got back with you. Gerald at this point I just want my money back and receipt. I am trying not to take you to court, but if I have to I will. So would you please get in touch with me.? [sic] I waited two hours for you on 11-15, 2007 by Albert/s house. You didn’t show up like you promise.
Ms. Coldman testified that she did not receive a response to her registered letter. The letter apparently went to the wrong address and was returned. Ms. Coldman testified that she sent the letter to the New Orleans address where she first met Mr. Biddy because she believed that was where Mr. Biddy was staying. She acknowledged that Mr. Biddy provided her with a Georgia address.
On cross-examination, Ms. Coldman stated that before she executed the Contract, she met with Mr. Biddy and discussed the removal of the foundation on her property. She testified that Mr. Biddy had indicated that he wanted to put [scinderblocks on the existing foundation, but she wanted the foundation removed because it was already sinking. Ms. Cold-man admitted that the draw schedule she was shown in June 2007 did not have a line on it for foundation removal. She also admitted that the Contract did not provide for removal of the slab. Nonetheless, she testified that she believed the phrase “foundation completed” entailed its removal. Ms. Coldman stated that Mr. Biddy knew he had to remove the foundation to build her home and agreed to do so; otherwise, she would not have executed the contract. She admitted, however, that the contract did not specifically provide in writing that Mr. Biddy had to remove the slab. Ms. Coldman testified that at no point did she order Mr. Biddy to stop working. Ms. Coldman stated that she *773 has since had the slab removed and entered into a contract with another contractor to rebuild her house for $106,000.00.[4]
Ms. Coldman admitted that the Contract did not state that Mr. Biddy was to rebuild her house from the ground up; rather, it only provided for Mr. Biddy to complete the plans, the foundation, the frame, the plumbing, and the exterior. Ms. Coldman, however, explained that Mr. Biddy verbally agreed to rebuild her entire house. Ms. Coldman admitted that this agreement was not put into writing. She further explained that initially a man named Mr. Abbott was going to do the inside, but Mr. Biddy advised her that Mr. Abbott was too slow, “pushed him out of the |fideal[,] ... and said that he [Mr. Biddy] was going to do the whole thing, everything, inside and out.”
The parties stipulated that Matthew Mitchell, a defense witness who was subpoenaed but failed to appear at trial, would have testified to the following: that he worked for Mr. Biddy in 2007 and was hired to work on Ms. Coldman’s home; that he and Mr. Biddy cleared the lot of overgrown grass and cut down a tree on her property; that the plan was to use the foundation that was already on the property for the new construction; that Mr. Biddy purchased bricks/bloeks and had hired a man to work on the foundation; that the job was stopped after he and Mr. Biddy laid the blocks out for the foundation because of disagreement about the foundation; and that they then restacked the blocks on the property. Although the State agreed Mr. Mitchell would testify as to these facts, it did not stipulate as to the veracity of those statements.
Mr. Biddy testified that he was living in Atlanta, Georgia. He listed his prior employment as including: working for the United States Air Force in the civil engineering squad, working for the City of Houston dealing with code compliance and public utilities, working as a public building inspector for another city in Texas, and owning his own construction and trucking company. He stated that in 2006 he had worked construction in Louisiana for an affiliate of a Houston based company. Mr. Biddy testified that he was licensed as a contractor in Texas, but not in Louisiana.
Mr. Biddy testified that he obtained Ms. Coldman’s name through a referral. He subsequently met with her to see if he could help her rebuild her Hurricane Katrina-damaged home. He discovered that if her home was rebuilt on the existing foundation, it could be grandfathered in, and she would not be subject to the [ 7stricter post-Katrina building code requirements. During the course of these discussions Ms. Coldman paid him a $500.00 retainer fee. He denied agreeing to remove the slab on her property. He explained that it would have required adhering to the stricter building code requirements; thus, it would have caused the contract price to increase “two-fold.” Mr. Biddy noted that neither the draw schedule, nor the Contract provided for removal of the foundation.
Mr. Biddy also denied ever agreeing to rebuild Ms. Coldman’s entire home. Rather, he testified that he only agreed to do the five items listed in the Contract— prepare the architectural engineering plans, complete the foundation, do “top-out” plumbing, build the frame, and paint *774 the exterior of the home. Mr. Biddy testified that he and Mr. Mitchell began working on the project by clearing the lot on two occasions.[5] During that time, a change order was being negotiated. They subsequently put the cinderblocks out on the foundation in order to raise it to the three feet required with the intention of putting one foot of deck board on top.[6] After they put the cinderblocks on the slab, Ms. Coldman informed him that she wanted the slab removed. Mr. Biddy stated this “add on” by Ms. Coldman caused them to stop working.
Mr. Biddy stated that the reason he did not complete the foundation was because he and Ms. Coldman had a dispute. Mr. Biddy testified that he met with Ms. Cold-man numerous times attempting to explain that pouring a new foundation would double the cost to build. He further testified that eventually she just “kind |sof fell off the radar.” Mr. Biddy said that Ms. Cold-man wanted him to “absorb almost twenty to forty thousand dollars’ worth of material and labor,” and he refused. As a result, he decided to “exercise” the “material breach of the contract” clause set forth in the Contract.
Mr. Biddy stated that he had given Ms. Coldman his Atlanta address and that he never received the November 2007 letter from Ms. Coldman because it was sent to a UPS store box in Atlanta. He testified that he was prepared to go forward with the construction until Ms. Coldman ordered him to stop. He further testified that he had hired several other individuals, in addition to Mr. Mitchell, to work on the project.[7]
On cross-examination, Mr. Biddy admitted that by July 16, 2007, the date Mr. Biddy was supposed to begin work, he had obtained approximately $16,000.00 of Ms. Coldman’s money. He agreed that the photograph depicting the slab and cinder-blocks on Ms. Coldman’s property did not represent $16,000.00 worth of work. Mr. Biddy also agreed that he was supposed to complete the job by October 16, 2007, but had not done so.
Mr. Biddy admitted he was not a licensed contractor in Louisiana. He explained that he did not need a license if the job was below $75,000.00. Although the Contract with Ms. Coldman exceeded that amount, he explained that the Contract for him and his organization did not go above $75,000.00. He stated that he did not have the alleged change order with him in writing and did not bring the medical documents showing that his knee was injured during the Contract period. |9Mr. Biddy testified that he hired his own plumber for the project, but he admitted that no plumbing work had been done on her property despite receiving $2,400.00 for it.
According to Mr. Biddy, he attempted to resolve the dispute with Ms. Coldman over the project several times. Contrary to Ms. Coldman’s testimony, Mr. Biddy said that he did in fact meet with Ms. Coldman at Mr. Landry’s house. He testified that if Ms. Coldman wanted to dispute the issue, she should have exercised the arbitration clause provided in the Contract. Mr. Bid *775 dy stated that he would have participated in arbitration proceedings if they were initiated by Ms. Coldman, and he would have paid her money back if the arbitrator awarded it to her.[8]

ERRORS PATENT

A review of the record for errors patent reveals that the district court failed to rule on Mr. Biddy’s motion to reconsider sentence. State v. James, 05-1468, p. 3 (La.App. 4 Cir. 10/4/06), 942 So.2d 569, 570. After the district court imposed a five year sentence, Mr. Biddy orally moved to reconsider the sentence. Defense counsel stated: “[f|or the record, Judge, I would ask that a Motion to Reconsider the Sentence be filed in the record.” The district court responded: “Okay. A Motion to Reconsider the Sentence is in the record.” The district court, however, did not rule on Mr. Biddy’s oral motion to reconsider; no written motion | inwas ever filed.[9] See La. C.Cr.P. art. 881.1(B) (motion to reconsider shall be oral at the time of sentence or shall be in writing thereafter).
Appellate courts are authorized, by statute, to remand to the district court, when appropriate, for a ruling on an outstanding motion to reconsider sentence. See La.C.Cr.P. art. 881.4(C) (providing that “[i]f necessary to an appropriate disposition of a motion to reconsider sentence, the appellate court may remand the case to the district court with instructions to supplement the record or to hold an evidentiary hearing.”) Moreover, this court consistently has refused to consider sentencing issues on appeal when there is an outstanding motion to reconsider sentence.[10] Accordingly, we are required to remand this case to the district court for it to rule on Mr. Biddy’s outstanding motion to reconsider sentence. This determination renders Mr. Biddy’s third assignment of error, challenging the excessiveness of his sentence, premature. See State v. Allen, 99-2579, p. 11 (La.App. 4 Cir. 1/24/01), 781 So.2d 88, 94. A trial court’s failure to determine a motion to reconsider sentence, however, does not preclude review of the conviction. State v. Foster, 02-0256, p. 3 (La.App. 4 Cir. 9/11/02), 828 So.2d 72, 74.

U,DISCUSSION

ASSIGNMENT OF ERROR NUMBER 1

Mr. Biddy’s first assignment of error is that the evidence is insufficient to support his conviction. This Court in State v. Brown, 12-0626, pp. 6-8 (La.App. 4 Cir. 4/10/13), 115 So.3d 564, 570-71, set forth the standard for evaluating a sufficiency of the evidence claim as follows:
*776 In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4th Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Id. at 1310. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from the Jackson reasonable doubt standard; rather, it is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).

Id.

[11]

In the instant case, Mr. Biddy was charged and convicted of theft in violation of La. R.S. 14:67, which at the time of the offense provided:
A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
B. (1) Whoever commits the crime of theft when the misappropriation or taking amounts to a value of five hundred dollars or more shall be imprisoned, with or without hard labor, for not more than ten years, or may be fined not more than three thousand dollars, or both.
The State was required to prove the following essential elements beyond a reasonable doubt: (1) that the defendant misappropriated or took by means of fraudulent conduct, practices, or representations; (2) a thing of value; (3) that be *777 longed to another; and (4) that the defendant had the intent to deprive the owner permanently of that which was misappropriated or taken. State v. Brown, 08-1434, p. 5 (La.App. 4 Cir. 3/18/09), 7 So.3d 1238, 1241 (citing State v. Pittman, 368 So.2d 708, 710 (La.1979)); La. R.S. 14:67(A). The State also was required to prove the value of the stolen property, which determines the severity of the theft and the punishment for a convicted offender. Brown, 08-1434 at pp. 5-6, 7 So.3d at 1241 (citing State v. Monterroso, 96-376, p. 5 (La.App. 5 Cir. 11/14/96), 685 So.2d 249, 251); La. R.S. 14:67(B).
113Theft is a crime of specific intent. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent may be inferred from the circumstances of a transaction and from the actions of the accused. Further, specific intent is a legal conclusion to be resolved by the fact finder. State v. Graham, 420 So.2d 1126, 1128 (La.1982) (citation omitted).
On appeal, Mr. Biddy claims that the evidence is insufficient to support his conviction because the State failed to prove that he took money from Ms. Cold-man without her consent or by fraudulent conduct and that he intended to permanently deprive her of the funds Ms. Cold-man paid him. Mr. Biddy points out that he never misrepresented to Ms. Coldman that he was a licensed Louisiana contractor because his Texas license number was listed on the Contract. He further notes that the State did not present evidence to refute his testimony that “because the price for the actual residence, as opposed to the prep work, fees, did not exceed a designated amount, a contractor’s license was not required at the time.” To support this contention, Mr. Biddy cites State v. Greene, 09-2723 (La.1/19/11), 55 So.3d 775, which looked to evidence of the contractor’s fraudulent representation of his status as a licensed contractor as proof of his intent to defraud under La. R.S. 14:68, the lesser included offense of unauthorized use of a movable. Mr. Biddy contends that his testimony that he would have participated in arbitration and paid any judgment awarded shows that he did not intend to permanently deprive Ms. Coldman of the amount owed.
Theft under La. R.S. 14:67 is not limited to situations in which a defendant has the intent to defraud at the time he takes possession; it also includes a | ^defendant’s “misappropriation” by fraudulent conduct of what is already in his possession. State v. Frost, 11-1658, p. 8 (La.App. 4 Cir. 9/5/12), 99 So.3d 1075, 1079-80. “[A] defendant can form an intent to steal after taking possession of property through honest means.” Frost, 11-1658 at p. 9, 99 So.3d at 1080 (citing State v. Hayes, 01-3193, p. 7 (La.1/28/03), 837 So.2d 1195, 1199). “[T]he timing of a defendant’s intent to deprive permanently is inconsequential, and the inquiry into that intent should focus only on whether such an intent was actually formed.” Frost, 11-1658 at p. 10, 99 So.3d at 1081 (citing State v. Pellerin, 118 La. 547, 43 So. 159, 161 (1907)).
Thus, the fact that Mr. Biddy did not initially make misrepresentations to Ms. Coldman — as to his contractor status or otherwise — does not mean that he did not subsequently form an intent to misappropriate the money that she paid him. Moreover, Mr. Biddy’s suggestion that he “would have” attempted to fulfill the contract or to repay Ms. Coldman if she had initiated arbitration does not necessarily negate a finding of criminal intent because *778 whether or not Mr. Biddy had the requisite intent is a question of fact that may be inferred from the circumstances. See Frost, 11-1658 at p. 9, 99 So.3d at 1080-81 (upholding theft conviction of a contractor despite that no misrepresentations were made by the contractor at the outset where his subsequent conduct, which included avoiding the victim, stopping work on the construction project, and failing to repay the victim, evidenced an intent to misappropriate the money he was paid).
In the present case, viewing all of the evidence in a light most favorable to the prosecution, a rational trier of fact could conclude that Mr. Biddy intended to permanently deprive Ms. Coldman of money in excess of $500.00 without her consent or by fraudulent means.
11sMs. Coldman’s testimony provides that she paid a total of $16,065.60 for Mr. Biddy to rebuild her home and that other than placing cinderblocks on top of her existing foundation, which she alleged was not part of their agreement, no work was performed on her property. Ms. Coldman also stated that she attempted to contact Mr. Biddy on several occasions regarding the lack of work being performed on her lot but had trouble getting in touch with Mr. Biddy. Ms. Coldman further testified that she did not tell Mr. Biddy to stop working on her home and that Mr. Biddy has made no attempt to reimburse her for the monies owed.
Mr. Biddy did not dispute at trial that he was paid over $16,000.00 to work on Ms. Coldman’s home. He admitted that he did not perform $16,000.00 worth of work on Ms. Coldman’s property; however, he claimed that in addition to placing the cinderblocks on the foundation, he removed debris and a tree from the lot. Ms. Coldman, on the other hand, stated that the tree remained on her property until 2010. The photograph of her property that the State introduced into evidence also reflected that Mr. Biddy did not clear the tree as it was visible in the photograph taken in September 2007.
Nonetheless, even assuming Mr. Biddy did perform some work on Ms. Coldman’s property, a trier of fact is not precluded from concluding that a defendant intended to permanently deprive the homeowner of her money because, as noted earlier, intent can be inferred from the circumstances. See State v. McMillian, 10-0812, pp. 7-8 (La.App. 4 Cir. 5/18/11), 65 So.3d 801, 805-06 (upholding conviction of contractor for theft when the contractor, after receiving money from victim, completed only three substandard tasks and did not return to the job site to complete the work). The record reflects that Mr. Biddy was paid 11fi$10,065.60 for eighty percent of the work that was to be performed on the foundation, $2,400.00 for plumbing, and $3,600.00 (the initial $500.00 retainer plus the $3,100.00 balance) for the architectural and engineering design plans, and that none of these tasks were completed. Thus, despite the testimony indicating that Mr. Biddy may have performed some work, which is contested by Ms. Coldman, Mr. Biddy failed to complete the work for which he was compensated.
Moreover, the fact that Mr. Biddy demanded and accepted payment from Ms. Coldman for the construction of her home and that Mr. Biddy did not use the money for that purpose also supports a finding that Mr. Biddy misappropriated the money without Ms. Coldman’s consent, by fraudulent representations, or both. See Frost, 11-1658 at p. 9, 99 So.3d at 1080-81; State v. Johnson, 11-1513, p. 6 (La.App. 4 Cir. 9/5/12), 99 So.3d 1057, 1061 (evidence was sufficient to convict a contractor of theft where the contractor accepted a large sum of money, only laid the foundation of the property, used a portion of the funds to *779 keep his business operational, and failed to repay the victim the funds she paid him).
Mr. Biddy, however, insisted in his testimony that the reason he did not complete the construction project was because he and Ms. Coldman had a dispute concerning the removal of the slab and because she ordered him to stop working. He stated that he attempted to resolve this issue. To do so, he met with Ms. Coldman several times and tried to explain to her that more funds were necessary to pour a new foundation on her property. Mr. Biddy further testified that if Ms. Coldman would have availed herself of the arbitration clause in the Contract, he 117would have participated and paid any judgment awarded to her.[12] Mr. Biddy’s testimony thus conflicts with Ms. Coldman’s testimony regarding what transpired between them.
Conflicting statements as to factual matters relate to the weight, not the sufficiency, of the evidence. State v. Jones, 537 So.2d 1244, 1249 (La.App. 4th Cir.1989). Such factual determinations rest solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. Id. A trier of fact’s determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984) (citations omitted); State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996 (citation omitted).
In this case, the Contract provided for Mr. Biddy to complete the foundation, but it did not specifically state what completion of the foundation meant. Thus, whether the parties agreed for Mr. Biddy to simply build on top of the existing foundation or to pour a new slab was a question of fact based on the credibility of the witnesses. Ms. Coldman testified that she had discussed with Mr. Biddy that she wanted her old foundation removed because it was sinking and that Mr. Biddy had agreed to do so. She also testified that she would not have executed the Contract otherwise. Mr. Biddy, however, stated that the plan was to use the existing foundation to avoid having to comply with the stricter building code requirements and to keep the price of the Contract down. The district court apparently believed Ms. Coldman’s testimony over that of Mr. Biddy.
11sThe district court also heard Ms. Cold-man’s and Mr. Biddy’s testimony concerning their communication during the contractual period and their efforts to work out the payment and slab issues. As noted earlier, Ms. Coldman testified that she made repeated requests for a refund and that Mr. Biddy never attempted to reimburse her. She also stated that Mr. Biddy refused to return her phone calls. Other than an email dated October 18, 2007, Mr. Biddy avoided contact with Ms. Coldman. On the other hand, Mr. Biddy testified that he met with Ms. Coldman at the home of a mutual acquaintance, Mr. Landry. Mr. Biddy also stated that he had attempted to resolve the slab dispute on numerous occasions and would have repaid Ms. Cold-man had she successfully pursued arbitration. The district court, again, as it is entitled to do as the trier of fact, chose to accept Ms. Coldman’s testimony and to reject Mr. Biddy’s hypothesis of innocence.
A review of the evidence and testimony does not suggest that the district judge’s decision to convict Mr. Biddy was contrary to the evidence. The record establishes *780 that Ms. Coldman paid Mr. Biddy $16,065.60 to perform work on her home that was never completed. There is also evidence in the record that Mr. Biddy avoided contact with Ms. Coldman, ceased working on her house, and made no attempt to reimburse Ms. Coldman the funds she paid him. A rational trier of fact could infer — based on Mr. Biddy’s actions and the surrounding circumstances— that Mr. Biddy intended to permanently deprive Ms. Coldman of the money owed to her in excess of $500.00. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 2

Mr. Biddy claims in his second assignment of error that the record does not reflect that he made a knowing and intelligent waiver of his right to trial by jury.
119Both the United States Constitution and the Louisiana Constitution guarantee an accused the right to a jury trial. U.S. Const, amend. VI; La. Const, art. I, § 17. If the punishment that may be imposed on a defendant exceeds six months confinement, the Louisiana Constitution provides that the defendant shall be tried by a jury; however, in non-capital cases “a defendant may knowingly and intelligently waive his right to a trial by jury.” La. Const, art. I, § 17. The method for making the selection is set forth in La.C.Cr.P. art. 780, which provides:
A. A defendant charged with an offense other than one punishable by death may knowingly and intelligently waive a trial by jury and elect to be tried by the judge. At the time of arraignment, the defendant in such cases shall be informed by the court of his right to waive trial by jury.
B. The defendant shall exercise his right to waive trial by jury in accordance with the time limits set forth in Article 521. However, with permission of the court, he may exercise his right to waive trial by jury at any time prior to commencement of trial.[13]
| ?,nThe waiver of the right to a jury trial cannot be presumed. State v. McCarroll, 337 So.2d 475, 480 (La.1976); State v. Santee, 02-0693, p. 3 (La.App. 4 Cir. 12/4/02), 834 So.2d 533, 534 (citation omitted). A waiver of the right to trial by jury is valid only if the defendant acted knowingly and voluntarily. State v. Kahey, 436 So.2d 475, 486 (La.1983); Santee, 02-0693 at p. 3, 834 So.2d at 534. Although the trial judge must determine if *781 the defendant’s jury trial waiver is knowing and intelligent, the determination does not require a Boykin-like colloquy. Santee, 02-0693 at p. 3, 834 So.2d at 535 (citation omitted).
The Louisiana Supreme Court and this court have recognized that while the preferred method is for the district court to advise a defendant of his right to trial by jury in open court before obtaining a waiver, that preferred practice is not statutorily required. State v. Pierre, 02-2665, p. 1 (La.3/28/03), 842 So.2d 321, 322; State v. Richardson, 575 So.2d 421, 424 (La.App. 4th Cir.1991). Likewise, it is preferred, but not necessary, for the defendant to waive his or her right to jury trial personally. Pierre, 02-2665 at p. 1, 842 So.2d at 322; State v. Wolfe, 98-0345, pp. 6-7 (La.App. 4 Cir. 4/21/99), 738 So.2d 1093, 1097. The jurisprudence has recognized that a knowing and intelligent waiver of a defendant’s right to a jury trial can be made even if the preferred practice of obtaining such a waiver is not followed.[14]
The Louisiana Supreme Court in State v. Phillips, 365 So.2d 1304, 1309 (La.1978), upheld a waiver by defense counsel when the defendant was present in |g1 court and failed to object when defense counsel made the waiver. Similarly, this Court in both Santee, 02-0693 at p. 4, 834 So.2d at 534-35, and Wolfe, 98-0345 at pp. 6-7, 738 So.2d at 1097-98, held that a defendant’s failure to object when his counsel informed the court that a bench trial had been chosen is to be construed against the defendant in determining the validity of the waiver made while he was present in court. See State v. Peters, 10-0326, p. 9 (La.App. 4 Cir. 2/16/11), 60 So.3d 672, 678, writ denied, 11-0494 (La.9/30/11), 71 So.3d 279.
In the instant case, the record reflects that Mr. Biddy was represented by counsel and that he was advised of the right to jury or bench trial at his arraignment. Mr. Biddy was also informed at the preliminary hearing that he had “the right to select his method of trial” and that he should “select a Judge or Jury Trial” forty-five days prior to the trial date. The transcript of the hearing reflects that defense counsel conferred with Mr. Biddy, and defense counsel then advised the district court that .the selection would be made at a later date. Subsequently, on October 13, 2011, defense counsel filed a “Notice of Election of Bench Trial,” which specifically stated that Mr. Biddy “waive[d] his right to trial by jury in this matter and elect[ed] to proceed to trial before the Court alone.” The discussion noted in the preliminary hearing transcript and the subsequently filed notice suggests that defense counsel had conferred with Mr. Biddy at length about the waiver before electing a bench trial. Additionally, on the morning of trial, the trial judge asked defense counsel “[n]ow, this gentleman has chosen a Judge Trial, is that right?” Defense counsel replied: ‘Tes, sir.” Mr. Biddy was present when defense counsel confirmed that Mr. Biddy had selected a bench trial, and Mr. Biddy made no objection to his counsel’s statement. As in the Wolfe and San tee cases, Mr. Biddy’s failure to object to defense counsel’s waiver is construed |22against him. The trial transcript also reveals that Mr. Biddy testified in his own defense, was alert, and was able to answer the attorneys’ questions. The record thus reflects *782 that Mr. Biddy understood the proceedings and the issue of waiving his rights.
Although Mr. Biddy did not personally waive his right to jury trial in open court, which is the preferred practice under the Louisiana jurisprudence, the record establishes that he knowingly and intelligently waived his right to a jury trial. As discussed above, our finding that Mr. Biddy made a knowing and intelligent waiver is established by the following facts: the written notice waiving the jury that was filed by defense counsel after conferring with Mr. Biddy, defense counsel’s confirmation of Mr. Biddy’s request for judge trial, Mr. Biddy’s silence after defense counsel’s statement, and Mr. Biddy’s understanding and awareness of the proceedings. See Denson, 11-0517 at p. 8, 83 So.3d at 1189 (finding that the defendant knowingly and intelligently waived his right to trial by jury where the defendant’s counsel affirmed that defendant had chosen a judge trial, and the defendant did not object at that time or on the day of trial). Accordingly, Mr. Biddy’s second assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 3

In his final assignment of error, Mr. Biddy argues that the district court imposed an excessive sentence and failed to provide adequate reasons for imposing the sentence. As noted, given the record indicates that the district court failed to rule on Mr. Biddy’s motion to reconsider sentence, a review of this issue is premature. See Allen, 99-2579 at p. 1011, 781 So.2d at 94.

DECREE

| güFor the foregoing reasons, the defendant’s conviction is affirmed. This case, is remanded to the district court for a ruling on the defendant’s outstanding motion to reconsider sentence. The defendant’s right to appeal the district court’s ruling on his motion to reconsider sentence and his sentence are reserved.
CONVICTION AFFIRMED, REMANDED WITH INSTRUCTIONS.

. The bill of information originally stated that August 7, 2007, was the date of the theft. On March 19, 2012, the bill was amended to state that the theft occurred during the period of June 5, 2007, through November 15, 2007. Although the bill charged Mr. Biddy with theft of over $1,500.00, at the time that Mr. Biddy committed the alleged theft, La. R.S. 14:67(B)(1) provided for theft of property valued over $500.00, and there was no separate category for theft over $1,500.00. Nonetheless, we find this error harmless given the charged amount exceeds $500.00 and given the trial court sentenced Mr. Biddy within the sentencing guidelines required by the statute at the time of the offense (the maximum sentence for both theft of $1,500.00 under the current statute and for theft of $500.00 under the 2007 statute is ten years).

. According to Ms. Coldman, the "change order” mentioned in Mr. Biddy's email was in reference to the fact that her water had to be cut off from the city’s water by a plumber before Mr. Biddy could install any plumbing. She testified that Mr. Biddy never contacted the plumber that she hired for the job.

. Albert Landry is the individual who apparently introduced Mr. Biddy and Ms. Coldman.

. The State introduced the following exhibits into evidence: the Contract; the June 2007 draw schedule; the four checks Ms. Coldman wrote to Mr. Biddy; the document authorizing Mr. Biddy to act as Ms. Coldman’s agent; two photographs Ms. Coldman took of the property in September of 2007; the October 2007 emails; the November 19, 2007 letter; and Ms. Coldman's receipt for $1,600.00 for slab removal.

. Ms. Coldman testified that she only had one tree on her lot, which remained on her lot until approximately 2010, and that Mr. Biddy never removed the tree.

. Mr. Biddy stated that the photographs, which the State introduced into evidence, were taken after he removed the blocks off the slab so he could do the change order.

.Mr. Biddy stated that he also hired James Jefferson, a masonry contractor; Darryl Coleman, a commercial landscaper; Jeffery Matthews, who assisted with the design and engineering aspect; and others he brought in from Alabama to help him work on Ms. Cold-man’s home.

. The defense introduced into evidence the construction contract that Ms. Coldman entered into in 2009 for $106,000; the October 2007 email exchange between Ms. Coldman and Mr. Biddy; and the stipulation.

. The State claims in its brief that the trial court denied Mr. Biddy’s oral motion to reconsider; however, neither the transcript nor the minute entries reflect that such a ruling was made.

. See State v. Davis, 00-0275, pp. 10-11 (La.App. 4 Cir. 2/14/01), 781 So.2d 633, 640 (issue of excessive sentence not properly before the court of appeal where district court did not rule on the defendant’s motion to reconsider sentence); State v. Foster, 02-0256, p. 3 (La.App. 4 Cir. 9/11/02), 828 So.2d 72, 74 (it is procedurally incorrect to review a defendant’s sentence prior to the district court's ruling on a motion to reconsider sentence); State v. Allen, 99-2579, p. 12 (La.App. 4 Cir. 1/24/01), 781 So.2d 88, 95 (issue of excessive sentence not considered or addressed where district court did not rule on the defendant’s motion to reconsider sentence); State v. Ferrand, 03-1746, p. 3 (La.App. 4 Cir. 1/14/04), 866 So.2d 322, 324; State v. Hailey, 02-1738, p. 4 (La.App. 4 Cir. 9/17/03), 863 So.2d 564, 566; see also State v. Bolden, 03-266, p. 22 (La.App. 5 Cir. 7/29/03), 852 So.2d 1050, 1064-65; State v. Sanders, 618 So.2d 904, 905 (La.App. 1st Cir.1993).

. See State v. Sparkman, 08-0472, pp. 6-7 (La.App. 4 Cir. 1/28/09), 5 So.3d 891, 895 (noting that the Jackson standard is legislatively embodied in La.C.Cr.P. art. 821(B), which provides that a "post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty.”)

. Mr. Biddy states in his brief that he had no notice that the dispute with Ms. Coldman could result in a criminal action; however, the record reflects that Ms. Coldman notified Mr. Biddy of her intention to bring the matter to the district attorney’s office.

. The Louisiana Legislature in 2013, subsequent to the trial in this case, amended La. C.Cr.P. art. 780; as amended, Article 780 provides:
A. A defendant charged with an offense other than one punishable by death may knowingly and intelligently waive a trial by jury and elect to be tried by the judge. At the time of arraignment, the defendant in such cases shall be informed by the court of his right to waive trial by jury.
B. The defendant shall exercise his right to waive trial by jury in accordance with the time limits set forth in Article 521. However, with permission of the court, he may exercise his right to waive trial by jury at any time prior to the commencement of trial Article I, Section 17 of the Constitution of Louisiana. The waiver shall be by written motion filed in the district court not later than forty-five days prior to the date the case is set for trial. The motion shall be signed by the defendant and shall also be signed by defendant's counsel unless the defendant has waived his right to counsel.
C. The defendant may withdraw a waiver of trial by jury unless the court finds that withdrawal of the waiver would result in interference with the administration of justice, unnecessary delay, unnecessary inconvenience to witnesses, or prejudice to the state. With the consent of the district attorney the defendant may waive trial by jury within forty-five days prior to the commencement of trial.
D. A waiver of trial by jury is irrevocable and cannot be withdrawn by the defendant.

. See State v. Kahey, 436 So.2d 475, 486 (La.1983); State v. Denson, 11-0517, p. 7 (La.App. 4 Cir. 1/25/12), 83 So.3d 1183, 1188-89, writ denied, 12-0391 (La.6/22/12), 91 So.3d 967; State v. Bryant, 06-1154, p. 7 (La.App. 4 Cir. 1/10/07), 950 So.2d 37, 41 (noting that both the Supreme Court and this Court have rejected an absolute rule that would require the trial judge to personally inform a defendant of his right to a jury trial).